Cleo L. Gord, appellant, v. Iowana Farms Milk Company, a corporation, et al., appellees.

No. 48320.

(Reported in 60 N.W.2d 820)

November 17, 1953.

Edward A. Doerr and Carl H. Lambach, both of Davenport, for appellant.

Robert D. Wells, William W. Brubaker and Edward N. Wehr, all of Davenport, for appellees.

WENNERSTRUM, J.—Plaintiff brought an action in equity wherein he sought to have canceled certain shares of stock issued to the defendants Evelyn Runkel Moore and Helen E. Helble by the Iowana Farms Milk Company, a closely held corporation. He claimed there was issued to these defendants stock in excess of their pre-emptive subscription rights of an authorized issue and also asked that it be decreed that plaintiff is entitled to exercise his pre-emptive right of purchase in the stock authorized to be issued in his proportionate share of previously held stock. As an alternate remedy the plaintiff sought to have the defendants Glenn H. Moore, Evelyn Runkel Moore and Helen E. Helble held to account to plaintiff for any profits made by Evelyn Runkel Moore and Helen E. Helble by reason of the stock issued and that judgment be entered against them and in favor of the plaintiff for such sum as may be found to be due him. The trial court held against the contentions of the plaintiff and dismissed his petition. He has appealed.

In the fall of 1932 the plaintiff, Cleo L. Gord, and the defendants Glenn H. Moore and Helen E. Helble commenced the operation of the Iowana Farms Milk Company as individuals

4

after the acquisition of a dairy business then owned by G. Watson French, a Davenport industrialist. This business was incorporated in November 1932 and at the time of its incorporation Glenn H. Moore was elected president and director and has since continued to so act. Cleo L. Gord was elected secretary and treasurer and director of the corporation and so continued to act until February 1950. He was not re-elected an officer and director at the corporate meeting held at that time. In February 1951 he terminated his employment with the company.

Prior to the acquisition of the dairy business by Moore and Gord the latter had been manager of Iowana Farms then owned by French, who, in connection with his farming operations, also was engaged in the wholesale and retail sale of dairy products in Davenport and near-by cities. Gord was graduated in 1926 from Iowa State College with a degree of Bachelor of Science in Dairy Industry. Prior to his employment by French in December 1930 he had been employed by several companies engaged in the sale of dairy and kindred products in Iowa and elsewhere. Mrs. Helble, formerly Helen E. Grell, had also been an employee of French as a bookkeeper for some time prior to the acquisition of the dairy business by the Iowana Farms Milk Company. At the time of the incorporation of this company she was elected vice-president and director and has so continued to act up to the time of the trial. The three officers to whom reference has been made constituted the board of directors from the time of the incorporation to February 1950.

The original capital was furnished at the time of the purchase of the dairy by Moore and Gord and a mortgage was given to French on the equipment with provision for small periodic payments. At the time of the incorporation common stock was issued at the established par value of $10 per share. Glenn H. Moore furnished $3500, Cleo L. Gord furnished $1670 and Helen E. Helble $30. Their respective shares amounted to 67.3%, 32.1% and .6% and so continued in almost this same proportion until November 26, 1949. Immediately prior to this last named date Glenn H. Moore held 715 shares and Evelyn Runkel Moore, wife of Glenn H. Moore, held 362 shares or a total of 1077 shares. Their respective proportions of the total stock

issued was 42.77% and 21.65% or a total of 64.42%. At this same time Cleo L. Gord held 562 shares of common stock or 33.61% and Helen E. Helble 33 shares or 1.97%.

Glenn H. Moore commenced his connection with the dairy industry in Cedar Rapids, Iowa, in 1916. During most of the subsequent period until 1932 he was engaged in several dairy enterprises, in some of which his father-in-law furnished a substantial portion of the necessary capital. In April 1932 he was employed in Rock Island, Illinois, by the Peerless Dairy Company. During the summer of 1932 he had conversations with Mr. French, previously mentioned, relative to the acquisition of the French dairy and his milk distribution business. Prior to this time Cleo L. Gord had been in charge of the French dairy offices and its accounts and this arrangement was continued by the new purchasers.

At the time the French dairy was acquired seven milk distribution trucks were in use. Under the new owners the business developed and prospered and in 1937 the dairy corporation began the construction of a new plant in Bettendorf, a city adjacent to Davenport. The operation of the business continued at the Iowana Farms until February 7, 1938, when the Bettendorf plant was opened. Gord's duties consisted largely in supervising the distribution of the dairy products. Moore was in charge of production and the finances and was generally the office executive.

The dairy corporation had been promised financial assistance by a Davenport bank to make possible the construction of the new plant at Bettendorf. This arrangement was not carried out because the financial institution concluded it was not advisable to lend money on a one-purpose building. At the suggestion of Glenn H. Moore, Cleo L. Gord went to Chicago and sought financial assistance through the Reconstruction Finance Corporation. Funds from this lending agency were finally obtained in August of 1938. This loan was paid off in August 1942. In 1937 or 1938 Elmer A. Runkel, the father-in-law of Glenn H. Moore, bought an entire issue of preferred stock in the amount of $5000. This stock, however, was later given to his daughter, Evelyn Runkel Moore. During the development and growth of the Iowana Farms Milk Company, Mrs.

Moore lent to the corporation a considerable amount of money from her individual funds.

The individual business activities of Glenn H. Moore and Cleo L. Gord were also successfully carried on. During the summer of 1941 Gord and Moore acquired what has been referred to as the Ivanhoe Farms for $22,500. They made a down payment of $1500 and a further payment of $2500 on March 1, 1942, and subsequent payments were made until the purchase-price obligation was liquidated. It was purchased on an equal basis. Mrs. Moore lent Gord money so that he could be on an equal basis with Glenn H. Moore in the operation of the farm. The Ivanhoe Farms were sold July 1, 1951, for $75,000, and equal distribution of this amount made to the two owners.

In 1943 Gord and Moore purchased 185 acres of the Iowana Farms—a portion of the French property. The purchase price is not disclosed by the record but it was sold in 1950 for $116,000 to the Aluminum Company of America. In connection with the settlement of this transaction, at Gord's insistence, Moore received $10,000 in excess of an equal distribution of the proceeds of the sale. This additional payment to Moore apparently was made by reason of services rendered by him in connection with the operation of this property and its sale. From a study of the record it would appear each partner received $40,000, Moore received an additional $10,000, as previously stated, and of the amount remaining $20,000 was lent to the Iowana Farms Milk Company, the corporation. The disposition of the amount remaining from the proceeds of the sale is not set forth. It is also shown by Moore's testimony that in addition to the $20,000 loan to the Iowana Farms Milk Company other funds were lent to it out of proceeds of the liquidation of the Iowana Farms and the personal property on it. The total amount, apparently, lent the milk company at this time was $42,300. There is no showing other than that these loans were jointly held by Moore and Gord. In the purchase of the farm properties, mortgages were given to a Davenport bank.

As previously stated, during the growth and development of the dairy business Evelyn Runkel Moore lent the corporation various amounts at different times. For these loans, notes were issued which carried seven per cent interest. It was testified

to by Moore that as of December 31, 1948, the Iowana Farms Milk Company was indebted to Evelyn R. Moore in the total sum of $18,380 and to Helen E. Helble in the amount of $1015. Both of these notes were demand notes and bore seven per cent interest. It was further testified to by Moore that as of December 31, 1950, the Iowana Farms Milk Company was indebted to Evelyn R. Moore on demand notes bearing seven per cent interest in the respective amounts of $17,000, $13,000, $2000, and $1200. As of this same date he also testified the corporation was then further indebted to Helen E. Helble in the principal amount of $1800 on a promissory note bearing seven per cent interest and due January 1, 1954. He further testified that as of this same date the corporation was indebted to the Iowana Milk Farms, the partnership between Moore and Gord, in the respective amounts of $14,000, $4000, $20,000, and $4300. Each of these notes bore interest at four per cent. The testimony of Moore further discloses that as of December 31, 1949, the corporation owed a Davenport bank $107,000, which obligation bore four per cent interest and was secured by a mortgage on all the land, buildings and equipment of the company along with certain personal assets belonging to Moore and Gord. It was payable $2000 per month.

The balance sheet of the corporation for December 31, 1949, which it was stipulated was correct, showed total assets of $560,121.90. The liabilities were shown to be $267,954.21. The total net worth of the corporation included total capital stock issued and outstanding in the amount of $46,430, premium received on sale of capital stock, $31,177.50, and earnings retained for use of business, $214,560.19, or a total net worth of $292,167.69. As evidence of the successful operation and development of the corporation a statement which was stipulated to be correct showed the sales in 1943 were $552,000 and in 1949 were $1,190,000. This stipulation further showed that earnings per share on 1672 shares of common stock in 1943 were $8.84 and in 1949 were $40.59.

The particular circumstances which have occasioned this litigation developed by reason of the authorization of the issuance of additional common stock at a directors' meeting held on November 26, 1949.

Prior to or at the time of the meeting each of the three directors signed a waiver of notice of the time, date and place of the special meeting to be held.on that date and in said waiver the purpose of the meeting was stated to be "to discuss the authorization of more common stock and retirement of some notes." The minutes of this meeting in their entirety are as follows:

"The meeting was opened by the President, after a discussion, the following resolutions, upon motion duly made seconded and unanimously carried, were adopted, to-wit:

"RESOLVED: Checks to be drawn payable to Helen E. Helble in the amount of $3615.00 to balance her note account and to pay Evelyn R. Moore $20,000.00 to pay some notes held by her. Helen E. Helble and Evelyn R. Moore elect to purchase common stock at $15.00 a share in the company.

"The Board hereby gives Ralph E. Baker and Gayle Whyte each 24 months option to buy 100 shares common stock in the Iowana Farms Milk Company at $50.00 per share in cash provided the said Ralph E. Baker and Gayle Whyte become associated with our Company.

"The Board authorizes the issuance of 3300 shares of common stock.

(Signed) C. L. Gord
"C. L. Gord, Secretary"

On this same date at the request of Glenn H. Moore, Cleo L. Gord signed the following statement: "At the present time I do not elect to purchase any stock in the Iowana Farms Milk Company." A similar paper was signed by Glenn H. Moore. On this same date Evelyn Runkel Moore and Helen E. Helble each signed separate papers which are as follows: "At the present time I do elect to purchase stock in the Iowana Farms Milk Company."

In connection with the signing of the statement heretofore set forth Gord testified as follows:

"Previous to the board meeting, Mr. Moore had asked me if I could buy some more stock and I told him I couldn't be-

cause I did not have the money. When he gave Exhibit 'A' [election not to purchase stock at present time] to me to sign, he said it was customary under the conditions and that he had had to sign a similar paper in Cedar Rapids with the company that he was interested in. I knew he was going to have to sign one so I signed it.

"It was several days before the meeting that Mr. Moore asked me whether I cared to invest any additional funds in the stock of Iowana Farms Milk Company—between two days and a week, I would say."

Gord also testified that in his previous discussion nothing was said about the value of stock of the milk company nor was any statement made to him about the price of any of the stock proposed to be issued. The matter of the price of the stock was not discussed. He further testified that at the board meeting the discussion pertained to the proposed purchase by Mrs. Moore and Mrs. Helble of stock for $15 a share. And there was further discussion regarding the possibility of a Mr. Baker and a Mr. Whyte joining the organization and the inducement to get them to join was to sell them stock at $50 a share. His testimony also discloses the resolution was then passed which authorized the issuance of 3300 shares of stock. He states this resolution was passed without any further discussion regarding the price. He also testified that other than as set out in the resolution there was no price mentioned regarding the 3300 shares and there was no time fixed for the exercising of the purchase rights. Gord further testified that the matter of the value of the stock to be issued or the value of the stock issued prior to November 26, 1949, was not disclosed to him by Mr. Moore or Mrs. Helble and the first knowledge he had of it was in April of 1951 after he had looked into the matter. In this connection it perhaps should be stated the records show Cleo L. Gord signed the minutes of the meeting of November 26, 1949, and also signed the certificates of stock issued to Evelyn Runkel Moore and Helen E. Helble. Although Gord was secretary, it is shown by Mrs. Helble's testimony that after the first two or three years after the organization of the corporation she kept the records of the directors' and corporate meetings and then typed them and presented them to Gord for his signature.

Gord also testified that prior to November 26, 1949, the only means of knowledge which he had of the financial condition of the Iowana Farms Milk Company was through the annual audits. He stated he did not see any balance sheet or statement showing the financial condition prepared as of any other time of the year. These audits were made by accountants employed by the company through Mr. Moore and Mrs. Helble. He also stated he had very little relationship with the auditors and their work. It was shown that these audit reports were never delivered to Gord but were delivered to the office and if he wished to examine an audit report he would make inquiry of Mr. Moore or Mrs. Helble. Gord further testified that prior to April 1951 he did not know anything regarding the payment of a bonus to Mrs. Helble for the year 1949 in the amount of $3342.50 and the issuance to her of 95½ shares of stock. Gord also stated whenever he sought information relative to the financial affairs of the company he obtained it from Mr. Moore and Mrs. Helble and he never figured or computed the per share value of the stock of the Iowana Farms Company from any audit report and stated: "I don't think I would know how."

Further bearing upon the nature of the statements made by Mr. Moore the following is shown in his cross-examination: "Q. What I gathered from your testimony this morning was that you said to Mr. Gord, in substance, 'Would you care to purchase any additional stock of the Iowana Farms Milk Company?' And Mr. Gord replied, in substance, that he didn't care to. Was that about it? A. To the best of my knowledge that was about the gist of the conversation. * * * Well, I don't recall of any additional comment on it. Q. As far as you can recall that was the whole—— A. That's correct."

Mr. Moore, in his testimony, further stated during the last year of Mr. Gord's services as an officer and director of the corporation it had the largest volume of business it had ever had up to that time and the sales increased every year.

Although 3300 shares of stock had been authorized to be issued it is shown by the record only 2471 shares were issued before the end of the year 1949. One hundred shares were later issued in connection with a proposed purchase by Whyte.

Robert F. Fritzsche, a certified public accountant, in explaining an auditor's report as a witness for the defendants, testified relative to the respective pre-emptive rights the several stockholders had. He stated Glenn Moore was entitled to purchase 42.77% of the 3300 shares, which would amount to 1411 shares; that C. L. Gord was entitled to purchase 33.61% of the 3300 shares or 1109 shares; and Evelyn R. Moore was entitled to purchase 21.65% of 3300 shares or 715 shares. He also stated Helen E. Helble's share would apparently be 1.97% or 65 shares. In connection with this accountant's testimony it is shown that 95½ shares of common stock were considered due to Mrs. Helble in making up the 1949 audit. His further testimony was as follows: "A. I give you that figure in order to show how we arrived at this additional 95½ shares. Now, the assumption that we made in arriving at this figure was that since both Mr. Moore and Mr. Gord waived their right to purchase any additional stock that the other two remaining stockholders would be entitled to purchase the waived shares in proportion to their original stock holdings. On this assumption the ratio between Mrs. Helble and Mrs. Moore was 8.35 per cent for Mrs. Helble and 91.65 per cent for Mrs. Moore. Continuing the computation: Total number of shares, the rights to which were waived, were Mr. Gord, 1109; Mr. Glenn Moore, 1411—or a total of 2520 shares. Applying Mrs. Helble's 8.35 per cent ratio to these 2520 shares we came up with a figure of 210.5—210½ shares—additional that Mrs. Helble would be entitled to purchase. The 210½ added to the 65 shares which she made under her own pre-emptive right gave her a total of 275½ shares. She purchased 371 shares, the difference being 95½ shares. These 95½ shares were considered as being offered to her as an employee. The Commissioner of Internal Revenue, in a ruling IT-3795, in 1946 had ruled: 'If any employee received an option to purchase stock of an employer corporation, such employee realizes taxable income in the form of compensation to the extent of the difference between the fair market value of the stock when it is received and the price paid therefor.' This transaction occurred late in 1949 and at the time of our audit, which took place in February and March of 1950, certain shares of stock had been sold to Mr. Gayle Whyte at a price of $50.00 per share. Since

12

this sale was within a relatively short time after the sale to Mrs. Helble, we assumed the $50.00 sales price to Mr. Whyte to be fair market value. Based on this assumption we calculated that the additional compensation, or in this case premium received on sale of stock to Mrs. Helble, as far as the 95½ shares were concerned, was $35.00 per share, the difference between $50.00 and the actual price paid, $15.00. 95½ shares times $35.00 equals $3342.50, which is the amount that was added to premium received on sale of stock. I base my figure in connection with the term 'market value' solely upon the sale to Mr. Whyte. This computation was made by me in connection with the determination of income tax and for no other purpose. No stock was issued to Mrs. Helble in the amount of 95½ shares. By my computation and my assumption as to the law, I found that 95½ shares were subject to this employee gain which was taken as compensation to her." It is thus shown the accountant assumed the $50 sales price to Mr. Whyte to be the fair market value in making his computations.

Mrs. Helble in her cross-examination testified relative to the valuation of the stock proposed to be issued to Whyte and Baker as follows: "Q. Well, now, Mrs. Helble, Whyte and Baker stock was issued at $50.00. That's right, isn't it? A. That's right. Q. Were you aware when Mr. Fritzsche made his calculations that he was going to use that figure as a basis of computing your gain on the transaction—your taxable gain? A. No, I didn't know till after he had it figured. Q. But at some stage of the proceedings you did become familiar with that fact? A. Yes. Q. You didn't object that the figure was out of line, that it was excessive or anything of that kind, did you? A. No, I didn't. Q. As a matter of fact, the $50.00 figure was certainly very fair, wasn't it? A. That's true. * * * Q. Incidently, at whose suggestion was the price to Whyte and Baker fixed at $50.00, if you remember? A. Glenn H. Moore. Q. Mr. Moore suggested that. And when did he suggest that? A. At the meeting. Q. Had that same figure been discussed with you before the meeting? A. I think——yes, it had."

The plaintiff in his brief and argument presents the following propositions as basis for reversal: (1) The stock issued to

Helen E. Helble and Evelyn Runkel Moore was at a price substantially less than its reasonable value; (2) the defendants Glenn H. Moore and Helen E. Helble owed a fiduciary obligation to the plaintiff and failed to sustain the burden of showing affirmatively the discharge of this obligation; (3) this discharge requires that defendants affirmatively show (a) the plaintiff knew the issuance price to be substantially less than the reasonable value (b) that plaintiff understood the effect of the issuance would be such as to dilute the value of his own holdings (c) that defendants disclosed to plaintiff all they knew or reasonably should have known as to deficiencies in issuance price and the diluting effect of the issuance of the stock; (4) plaintiff did not waive his pre-emptive right of subscription; (5) plaintiff is not barred by laches from exercising his pre-emptive right of subscription; (6) plaintiff should be given the privilege to subscribe for 729 shares remaining unissued of the 3300 shares originally authorized; and (7) the 729 shares were not effectively withdrawn from subscription by plaintiff without notice to him.

As previously set forth, stock was sold to one Whyte at a price of $50 per share, which sale was on or about the time of the issuance of the stock to Evelyn Runkel Moore and Helen E. Helble at the price of $15 per share. As a basis for a showing that the stock sold to the two individuals last-named was grossly undervalued, the appellant sets forth (1) that the number of shares of stock of the corporation outstanding at the time of the purchase by Whyte (February 21, 1950) was 4243 shares; (2) that if the number of shares of stock previously issued were multiplied by $50—the price paid by Whyte—the value of the total stock outstanding, to the extent established and shown by the price of the stock, would be $212,150; (3) that if there is deducted the amount paid for 2571 shares between November 26, 1949, and January 11, 1950, at $15 per share, there would be deducted the sum of $38,565; (4) the balance remaining would equal the value of the 1672 shares outstanding on November 26, 1949, of $173,585, and (5) that if this last amount is divided by 1672 shares outstanding prior to November 26, 1949, the result would equal a per share value on this last named date, on the basis of the transaction with Whyte, of $103.22.

14

An investment dealer in Davenport, John T. Gerwe, testi-
fied in connection with his analysis of the corporation's balance
sheet and stated as of November 26, 1949, the value of the com-
mon stock before the new stock was issued was $160 per share.
He also stated that after the issuance of the additional 2571
shares of common stock the value of each share of issued stock
was $64. The trial court in its ruling stated the valuation of
$160 was fantastic.

The trial court held the plaintiff was well educated, was
skilled in the dairy business and his education and qualifications
perhaps exceeded those of the defendants. It also held in its
findings of fact that the plaintiff as sales manager knew the
amount of money the company took in and almost without ex-
ception signed all checks and notes given by the company and
knew what the company owed and to whom; that he knew all
the assets of the company; had assisted in obtaining a loan from
the Reconstruction Finance Corporation for the construction
of a new building and had secured from the auditors of the com-
pany their balance sheet and income accounts and knew what
they showed. It further held the plaintiff in his capacity was
a stockholder, officer and director and knew all the facts which
would be important in determining the value of the stock of
the company and there is no fact of which he denies having
knowledge except (a) that he did not know the value of the
stock and (b) that he did not know an increase in the stock
would have a tendency to dilute the value of the stock which
he owned. The court further held that the defendants Glenn H.
Moore and Helen E. Helble did not tell the plaintiff their
opinion of the value of the stock nor did he ask for it and further
held he had every opportunity to arrive at his own opinion as
to its value and knew all the facts upon which a market value
could possibly be based. It further held the defendants did not
make an exact mathematical computation of the effect of the
increase of the stock as it would affect the plaintiff, but the
plaintiff knew all of the facts on which he could make his own
mathematical computation and he was amply competent to do
so. It also held there was no fraud, actual, constructive or pre-
sumptive; nor any fraudulent concealment nor any unfair deal-
ings or imposition on the part of the defendants, or either of

them, against the plaintiff. It further held the plaintiff participated in the matters of which he has complained and consented and contributed in producing the results to which he now objects. It was its further holding that the plaintiff expressly in writing and by implication waived his pre-emptive rights in the distribution of the stock. The trial court made further detailed findings and also set out its conclusions of law and thereafter determined the plaintiff's petition should be dismissed at his cost.

I. A pre-emptive right to subscribe to an authorized new and increased issue of stock is the privilege given to the holder of original stock. He may purchase or obtain shares of the new issue in preference to nonholders and on equal terms with other holders. This right shall be in proportion to the number of the original shares held by the holder to the total outstanding number of the original shares. This is the general rule except where there are statutory or charter restrictions. Annotations 52 A. L. R. 221, 138 A. L. R. 527; Miles v. Safe Deposit & Trust Co., 259 U. S. 247, 42 S. Ct. 483, 66 L. Ed. 923; Fletcher, Law of Private Corporations (1932) Vol. 11, page 218, section 5135, and 1952 annotations. It cannot be defeated by any corrupt or fraudulent plan of the directors of a corporation or of other stockholders. 13 Am. Jur., Corporations, section 186, page 309.

II. The issuance of additional stock under pre-emptive rights due an original stockholder requires a disclosure of such facts as will afford to him full information pertaining to the issue and thus make possible the prevention of any advantage being taken of a shareholder. In 42 Harvard Law Review (1928–1929) 186, 188, it is stated: "It is the duty of directors as fiduciary agents, irrespective of any rule giving pre-emptive rights to shareholders, to exercise a power to issue additional shares, as well as all their other powers, in good faith for the benefit of the shareholders who constitute the corporation."

And in 43 Harvard Law Review (1929–1930) 586, the fiduciary relationship of a director in relation to the pre-emptive rights in the issuance of additional stock is commented on as follows: "Such definitions usually fail to recognize the essential distinction between the corporate doctrine of pre-emptive

16

right, and the universally accepted principle requiring the directors, as fiduciaries, not to use their position for their personal advantage or for that of their confederates, to the detriment of the shareholders."

And as further bearing upon the fiduciary responsibility of a director in connection with the issuance of stock under preemptive right it is stated in Steven v. Hale-Haas Corp., 249 Wis. 205, 228, 23 N.W.2d 620, 631:

"We consider, therefore, that plaintiff is right in his assertion that in a closely held corporation the fact that the issue is to be sold at materially less than its value may evidence an oppressive scheme directed against minority stockholders and render wholly invalid as an abuse of discretion, irrespective of provisions for pre-emptive rights, the corporate action authorizing the issue.

"The question in any given case is whether under all the circumstances, including the amount of disparity between the issuing price of the stock and its true value, the nature of the corporation, the known ability of stockholders to sell voting rights, or to invest further sums in the company, the scheme must be condemned as an oppressive device or an abuse of official discretion."

 · III. And bearing upon the fiduciary relation of corporate directors and officers, we stated in Des Moines Bank & Trust Co. v. Bechtel & Co., 243 Iowa 1007, 1081, 51 N.W.2d 174, 216: "It is the policy of the courts to put such fiduciaries beyond the reach of temptation and the enticement of illicit profit. These principles are founded on the soundest morality and have received the clearest recognition in all courts."

A director is required to act in the utmost good faith and not for his own personal interest. 13 Am. Jur., Corporations, section 997, page 949.

And in Hoyt v. Hampe, 206 Iowa 206, 220, 214 N.W. 718, 724, in referring to the fiduciary relationship of corporate directors this court stated: "That directors sustain a fiduciary relation to stockholders is conceded. The policy of the law is to put fiduciaries beyond the reach of temptation, by making it unprofitable for them to yield to it. To that end, an act by the

fiduciary in which personal interest and duty conflict is voidable at the mere option of the beneficiary, regardless of good faith or results. The court will not inquire into its profitableness to the trustee or prejudice to the beneficiary. This rule is applicable to the acts of boards of directors [citing cases]."

And a further holding concerning the obligation of directors to act in good faith in dealing with stockholders is set forth in Glenn v. Kittanning Brewing Co., 259 Pa. 510, 516, 103 A. 340, 342, L. R. A. 1918D 738, 740, Ann. Cas. 1918D 769, as follows: "Whenever there is an intimation that a director has violated the duty thus imposed upon him by virtue of his office, or has failed to act fairly and honestly toward those whom he represents, the law ceases to look at the mere form of the device or means employed and 'pierces through the surface and seizes upon the evils which lie within.'"

Although the case of Bettendorf v. Bettendorf, 190 Iowa 83, 96, 179 N.W. 444, 451, deals with the duty of an administrator who also acted individually in connection with the purchase of stock from an heir, yet the holding therein is applicable in the instant case where there is a director-officer fiduciary relationship to a fellow director and stockholder. In the cited case it is stated:

"We entertain no doubt that the defendant violated his duty as administrator in dealing with the plaintiff's interest in the property, in that he induced her to part with claims and property of great value, without any adequate understanding of the values with which she was parting; and this was due to his failure to bring to her knowledge explanation of the facts bearing thereon, and the extent to which the administrator, as an individual, was profiting by the contracts which he induced her to enter into."

There is authority for the holding that there is no fiduciary relationship between directors as such. Kenton v. Wood, 56 Ariz. 325, 107 P.2d 380, 383; Vertex Inv. Co. v. Schwabacher, 57 Cal. App. 2d 406, 134 P.2d 891, 899. These last cited cases are decided on issues not determinative of the relationship between directors. Then, too, in the instant case we are concerned with

18

the issue of fraud and its application to the acts of directors toward one of their associates.

IV. The burden of proving fairness is upon the directors in dealing with corporate property. State v. Exline Fuel Co., 224 Iowa 466, 471, 276 N.W. 41; Kurtz v. Oxborrow, 232 Iowa 174, 177, 4 N.W.2d 857; Des Moines Bank & Trust Co. v. Bechtel & Co., supra, at page 1081 of 243 Iowa. This rule and burden should also apply in dealings between directors who are stockholders, especially in a relatively small corporation in which the stock is closely held.

Although the record is quite extensive and we have of necessity limited our recital of the facts presented, yet we believe we have set forth the essential matters in connection with the disclosure, and from these facts it must be concluded the defendants Moore and Mrs. Helble did not disclose to the plaintiff the value of the stock. It likewise must be concluded they did not disclose to the plaintiff the diluting effect of the issuance of the new stock on his originally held stock. We hold these defendants have not met the burden which is theirs to show good faith and fairness in their dealings with the plaintiff.

V. It has been suggested in the defendants' pleadings and by the evidence presented that the plaintiff waived any pre-emptive rights he may have had.

It must be kept in mind there was no time limit stated in the claimed waiver he signed nor was there a complete waiver of a desire to purchase new stock. What he did sign was a paper stating, "At the present time I do not elect to purchase any stock in the Iowana Farms Milk Company." And at no later time did the succeeding board of directors place any limitation upon the time when the right to take his pre-emptive share must be exercised, and it is particularly true that no notice was ever given the plaintiff of the withdrawal of any right of purchase. It is true that at a meeting of the board of directors on February 15, 1951, the board withdrew the balance of unsubscribed stock authorized to be issued at the meeting of November 26, 1949. However, Gord was not then a member of the board of directors.

In the instant case the time when the plaintiff was first given an opportunity to exercise his pre-emptive rights was November 26, 1949. He made his demand for the issuance of

stock to himself in April 1951—after a period of approximately sixteen months had passed.

In a situation somewhat similar to the instant case it was stated in Upton v. Southern Produce Co., 147 Va. 937, 948, 133 S.E. 576, 579: "* * * a stockholder may waive his right to share in the distribution of unissued or new stock, and by his conduct ratify an issue to an outsider. That principle of law is unques-tionably sound, but it is applicable only in cases where the sale and purchase are untainted by fraud."

And in the case of First Trust & Savings Bank v: Iowa-Wisconsin Bridge Co., 8 Cir., Iowa, 98 F.2d 416, 427, it was held where consent of stockholders to fraudulent issuance of bonds was obtained without disclosure of the circumstances, this consent does not excuse or ratify the fraud.

Under the circumstances shown and the nature of the claimed waiver signed we hold the question of exercising the right of pre-emptive purchase within a reasonable time is not involved.

VI. The defendants also assert plaintiff's claim rights should be denied by reason of his laches in exercising his claimed pre-emptive rights of purchase.

It should be kept in mind the plaintiff commenced his action as soon as he had been able to ascertain the effect of the issuance of the new stock by the corporation. This information was first obtained in April of 1951. It cannot be held he delayed for an unreasonable time in bringing his action—September 10, 1951. Prior to this last date he was seeking to obtain information from the corporate records.

Delay in bringing an action does not amount to laches if there is no showing of prejudice by reason of the delay. Jennings v. Schmitz, 237 Iowa 580, 589, 20 N.W.2d 897, and cases cited. It is also stated in this last cited case that the doctrine of laches will be applied only where it would be inequitable to permit recovery or it is clearly demanded in the interest of justice. In the present case it appears the equities are with the plaintiff and it cannot be said the doctrine of laches should be applied in the interest of justice. To do so in this case would work grave injustice.

VII. We are particularly impressed with the equities of

this case as they apply to the rights of the plaintiff. An analysis of the record as heretofore set forth shows the stock in the Iowana Farms Milk Company prior to the issuance of the new stock had a book value far in excess of the value placed on the stock issued to Mrs. Moore and Mrs. Helble. There cannot be any question but that the issuance of the new stock materially lessened and diluted the value of the plaintiff's stock. It may be admitted there were no actual sales made to establish a market price, but the fact Moore and Mrs. Helble apparently instigated the placing of a valuation of $50 in the proposed sale of stock to Whyte, as well as their comments in their testimony, all show they realized the stock had a valuation over and above the price fixed of $15 per share as sold to Mrs. Moore and Mrs. Helble. Then, too, it is a circumstance to be considered that in paying off the indebtedness due Mrs. Moore and Mrs. Helble it was all done in connection with the issuance of stock to these two persons. The multiple type of the resolution passed on November 26, 1949, supports this conclusion. A further fact that can and should be considered is that although Glenn H. Moore signed the same type of waiver as Gord, he thus participated in placing additional stock in the hands of his wife. In this connection this court has held that a wife of a trustee is excluded from dealing with the trust property. Van Gorp v. Van Gorp, 229 Iowa 1257, 1263, 296 N.W. 354. And in the case of Mrs. Helble, she, as well as Moore, both acting in a fiduciary capacity, made possible a sale to Mrs. Moore and herself. As stated in Des Moines Bank & Trust Co. v. Bechtel & Co., 243 Iowa 1007, 1081, 51 N.W.2d 174, 216:

"Corporate directors and officers may under proper circumstances transact business with the corporation including the purchase or sale of property, but it must be done in the strictest good faith and with full disclosure of the facts to, and the consent of, all concerned. And the burden is upon them to establish their good faith, honesty and fairness."

It may be maintained Gord had the privilege of ascertaining what the book value of the stock was by reason of the opportunity to study and inspect the year-end balance sheets

for the years prior to November 1949. This may be admitted to be true for the purpose of argument but this fact did not preclude Moore and Mrs. Helble from the obligation to advise Gord of the diluting effect of the issuance of the new stock.

VIII. The plaintiff contends there remained 729 shares of unissued stock of the 3300 shares originally authorized. Although he was entitled under his pre-emptive rights to 1109 shares of the new stock, he seems willing to accept the 729 not issued and later withdrawn from issue by a subsequent directors' meeting. We are satisfied to take the plaintiff as he expresses himself in his brief and it is our holding that shares in the number of 729 be issued to him upon the payment into the corporation of $15 per share.

As we have heretofore stated, we do not find and hold the plaintiff has waived his right to accept a portion of the pre-emptive rights originally claimed to have been afforded him— and in this case, 729 shares at the price of $15 per share.

It may be contended Glenn H. Moore should also be entitled to exercise his pre-emptive right to purchase his proportionate share or 1411 shares of stock. In this connection it should be kept in mind Mrs. Moore purchased 2200 shares of the stock. Her pre-emptive right of purchase was 715 shares and Mr. Moore's pre-emptive right of purchase was 1411 shares. Their total rights of purchase amounted to 2126 shares, so she obtained 74 shares more than those to which the two of them were entitled. The decree hereafter ordered should provide for the cancellation of 1411 shares of her stock and its issuance to Glenn H. Moore, if said Moore so desires, provided he pay the sum of $15 per share into the corporation and said sum is reimbursed to Mrs. Moore.

By reason of our comments and holdings heretofore set forth the trial court is reversed and the cause is remanded for a decree in conformity with this opinion.—Reversed and remanded.

BLISS, OLIVER, GARFIELD, THOMPSON, and LARSON, JJ., concur.