David E. LINGE and C. Scott Linge
d/b/a Linge Investment
Company, Appellants,

and

Joan B. Allender and Central National Bank and Trust Company, Co-Executors of the Estate of Robert B. Allender, Deceased, William S. Blackburn, Steadman-Blackburn Agency, Inc., Koert S. Voorhees, Fred L. Bjornson, Michael G. O'Donnell, d/b/a O'Donnell Realty Company, Peter K. DeJuhasz, Monte R. Toso, James A. O'Brien, R. E. Doerfer, Donald M. Houpt, Arthur C. Meyer, Alfred Tieze, and Don O. Newland, Intervenors-Appellants,

v.

RALSTON PURINA COMPANY,
Keystone International Inc., and
Keyworld, Inc., Appellees.

No. 63286.

Supreme Court of Iowa.

June 18, 1980.

Rehearing Denied July 11, 1980.

Tom Riley, Lawrence E. Blades and Gregory M. Lederer of Simmons, Perrine, Albright & Ellwood, Cedar Rapids, for appellants.

John J. Greer, Dick H. Montgomery and Richard J. Barry of Greer, Nelson, Bertell, Montgomery & Barry, Spencer, for appellees.

McCORMICK, Justice.

A number of former minority shareholders of Keystone International, Inc. (Keystone), seek damages from defendants Ralston Purina Company (Ralston), Keystone, and Keyworld, Inc., a wholly owned subsidiary of Ralston, for alleged wrongs done them in a tender offer and subsequent short-form merger through which Ralston acquired their Keystone stock and merged Keystone into Ralston. The case was tried to the court at law, and the trial court held for defendants, dismissing the petitions. In seeking reversal, plaintiffs and intervenors (hereafter included in references to plaintiffs) contend the court misconceived the nature of their action, erred in sustaining defendants' objection to an exhibit, and was mistaken in holding that the short-form merger was effected in compliance with Iowa law. We affirm the trial court.

The sequence of events which led to this litigation is not in dispute. William Bergman, a Cedar Rapids attorney, organized Keystone in June 1969 to purchase land on Keystone Mountain, about seventy miles west of Denver, Colorado, in order to develop a ski resort. The corporation issued 1,650,000 shares of common stock at $1.00 per share. The stock was sold in a manner intended to qualify the transaction as a private offering. Bergman offered stock to Purina, for whom he had performed legal work, and Purina purchased fifty percent of the issue.

The proceeds of the first issue were used to purchase land, build a base lodge, and install ski lifts. The resort opened for the 1970–71 ski season, but a need for additional capital was soon perceived. A second stock issue, identical in amount to the first, was made in 1970. Existing shareholders purchased much of it through the exercise of preemptive rights, and Purina purchased enough additional stock to increase its holdings to sixty-three percent.

The building of condominiums and other development plans soon established a need for more capital. Ralston loaned Keystone $1,250,000 in September 1970. Soon thereafter, Keystone borrowed an additional $1,800,000 from Mercantile Trust Company of St. Louis after Ralston agreed to subordinate its loan.

Keystone operated at a loss through the 1971–72 ski season and soon needed even more capital. Mercantile Trust Company loaned it $4,700,000 in place of its prior loan. As of the end of that year, Keystone defaulted on a $2,480,000 payment owed to the bank. In May 1973 Keystone borrowed $300,000 more from Ralston to pay current operating expenses. Keystone lost more than $700,000 in the fiscal year ending May 31, 1973.

Keystone decided to build a commercial core to improve the attractiveness of its resort, but it was unable to borrow money for that purpose. Mercantile Trust Company was unwilling to loan the money unless Ralston would increase its equity position in Keystone. In May 1973 Keystone officers, led by Bergman, appeared before Ralston's budget committee and requested $14,700,000 in additional capital, approximately $10,000,000 of this as a loan, approximately $3,000,000 to be used to increase Ralston's equity position, and the remainder for the purchase of stock from minority shareholders in the event of a tender offer. If Ralston increased its equity to eighty percent, it could charge Keystone's losses against its taxable income. The Ralston budget committee approved the request, and Ralston's board authorized a tender offer to be made.

After consultation with Bergman, Ralston arrived at a price of $1.50 per share for minority stock. Because of a possible federal securities law problem, Ralston decided to offer minority shareholders that amount or an amount equal to the price paid for the stock by the shareholder plus six percent annual interest, whichever amount was greater. The tender offer package was mailed to Keystone shareholders on October 4, 1973. As a result of this tender offer, Ralston increased its ownership of Keystone stock to approximately ninety-three percent. After this tender offer had been completed, Ralston decided to acquire the remainder of Keystone's stock through the short-form merger procedure of chapter 496A, The Code. The merger was carried out by forming Keyworld, Inc., merging Keystone into the new corporation and changing the name of the new corporation to Keystone.

Plaintiffs were minority shareholders of Keystone who sold their stock to Ralston in response to the tender offer or gave it up as a result of the short-form merger. In this action they alleged their stock was wrongfully appropriated and sought actual and punitive damages. Their theory of recovery is a matter open to some question. They based the action at least in part on a claim of fraud, and then alleged defendants breached their fiduciary duty. Although the case was originally scheduled for jury trial, the parties waived a jury and tried the case to the court. After a lengthy trial, the court held for defendants. Plaintiffs appealed.

I. *The theory of the action.* Plaintiffs' main contention is that the trial court erred in holding there is no difference between the essential elements of common-law fraud and breach of fiduciary duty. This assignment of error assumes that a fiduciary duty is owed by a majority shareholder dealing with minority shareholders. It also assumes that the case was pled, tried, and decided on two separate theories of recovery, common-law fraud and breach of fiduciary duty.

In response to a request for admissions, defendants admitted Ralston owed a fiduciary duty to Keystone's minority shareholders. We have not had occasion to decide whether majority shareholders owe a fiduciary duty to minority shareholders, and of course we are not bound by agreement of the parties as to the law. However, our cases have recognized the fiduciary duty of officers and directors in dealing with the corporation and its shareholders. *See, e. g. Rowen v. Le Mars Mutual Insurance Co.,* 282 N.W.2d 639, 649 (Iowa 1979); *Holi-Rest,*

*Inc. v. Treloar*, 217 N.W.2d 517, 525 (Iowa 1974); *Holden v. Construction Machinery Co.*, 202 N.W.2d 348, 356–58 (Iowa 1972); *Gord v. Iowana Farms Milk Co.*, 245 Iowa 1, 16–17, 60 N.W.2d 820, 829 (1953).

The same reasoning supports recognition of a fiduciary duty between a dominant shareholder and minority shareholders. By being in a position to manage corporate affairs through control of the board of directors, a majority shareholder is in the same relationship to minority shareholders as the directors themselves. Other courts have recognized the resulting fiduciary duty. *See, e. g., Allied Chemical & Dye Corp. v. Steel & Tube Co.*, 14 Del.Ch. 1, 12, 120 A. 486, 491 (1923) ("The same considerations of fundamental justice which impose a fiduciary character upon the relationship of the directors to the stockholders will also impose, in a proper case, a like character upon the relationship which the majority of the stockholders bear to the minority.").

■ We hold that majority shareholders do owe a fiduciary duty to minority shareholders. Therefore we accept the agreement of the parties that Ralston owed such a duty to plaintiffs in the present case.

■ We also accept the contention of plaintiffs that their petition was sufficient to support a claim of breach of fiduciary duty as an independent ground for recovery. They alleged breach of fiduciary duty separately from their allegations of fraud and nothing in the petition purports to limit the theory of recovery to common-law fraud. Under principles of notice pleading, plaintiffs would not be limited to proof and recovery on the basis of fraud alone. *See Christensen v. Shelby County*, 287 N.W.2d 560, 563 (Iowa 1980).

Nevertheless the trial court denied recovery on the fraud theory only. The court treated the fiduciary duty as affecting the scope of the duty of disclosure and the burden of proof on the fraud theory rather than changing the elements of the theory or constituting a separate basis for recovery. The court said:

For the purpose of this ruling I will adopt the legal conclusion that a fiduciary relationship exists between a majority stockholder and the minority stockholders. In dealing with the minority, the majority stockholder must exercise the highest standard of good faith, honesty and openness in every significant aspect. A majority's stock purchase from the minority must be preceded by a full and complete disclosure, without misrepresentations or omission, of all material and relevant facts which would enable the minority to make an informed decision.

The acceptance of this concept does not change the nature of the action—it remains an action based on common law fraud. However, it does become important in allocating the burden of proof.

As to the burden of proof on the fraud theory, the court thought the fiduciary relationship should cause only the burden of going forward with evidence as opposed to the burden of persuasion to shift to defendants. However, because the court believed this court had held otherwise, it accepted the contention of plaintiffs "that the existence of the fiduciary relationship casts upon the Defendants the burden of disproving fraud by a preponderance of clear, convincing and satisfactory evidence."

After detailing its specific findings of fact, which were all adverse to the allegations of plaintiffs, the court concluded:

The Defendants, individually and jointly, have sustained the burden of proving by a preponderance of the clear and convincing evidence that there was no willful or reckless misrepresentation of any material fact or concealment and non-disclosure of any material fact in the entire proceedings in issue which would have affected the judgment of any Plaintiff in making an informed decision as to whether or not he should accept the tender offer; that there was no breach of any fiduciary duty which may have governed the relationship between the parties; that there were no material misstatements of fact nor omissions to state any fact of which any Defendant or Defend-

ants had knowledge or of which they could have reasonably acquired knowledge; that the short form merger proceedings in 1974 accorded to the provisions of the Iowa statutes and [were] not the culmination of a fraudulent scheme; and that the elements of fraud which might support a recovery by Plaintiffs just did not exist.

Plaintiffs acknowledge that the findings of fact of the trial court have the force of a jury verdict and are conclusive if supported by substantial evidence. However, they contend the findings were induced by application of erroneous principles of law. *See Farmers Insurance Group v. Merryweather*, 214 N.W.2d 184, 186–87 (Iowa 1974) ("These principles do not preclude inquiry into whether trial court applied erroneous rules of law which materially affected its decisions.").

Specifically, plaintiffs contend the court erred in failing to give effect to a distinction between common-law fraud and breach of fiduciary duty. They assert the distinction is that recovery may be had for breach of fiduciary duty in misrepresenting or failing to disclose material facts regardless of an absence of scienter or intent to deceive. They argue that breach of fiduciary duty, whether viewed as a separate tort or a modification of the fraud theory, constitutes a different basis for recovery than common-law fraud.

Breach of fiduciary duty has been recognized in other jurisdictions as a basis for recovery distinct from fraud. *See generally* F. O'Neal, *"Squeeze-Outs" of Minority Shareholders* § 7.13 (1975). Illustrative cases include *Jones v. H. F. Ahmanson & Co.*, 1 Cal.3d 93, 81 Cal.Rptr. 592, 460 P.2d 464 (1969); *Fisher v. Pennsylvania Life Co.*, 69 Cal.App.3d 506, 138 Cal.Rptr. 181 (1977); *Roland International Corp. v. Najjar*, 407 A.2d 1032 (Del.1979); *Lynch v. Vickers Energy Corp.*, 383 A.2d 278 (Del.1977); *Singer v. Magnavox Co.*, 380 A.2d 969 (Del.1977); and *Tanzer v. International General Industries*, 379 A.2d 1121 (Del.1977).

However, while we have recognized that the existence of a fiduciary duty will affect the burden of proof in a fraud case, we have not been required to decide whether it will either eliminate elements or constitute an alternative basis of recovery. In *First National Bank v. Brown*, 181 N.W.2d 178, 182 (Iowa 1970), we recognized that when a fiduciary relationship exists the duty of disclosure is affected in that "the superior party has a duty to disclose all material facts of which he is aware, or at least those favorable to his position and adverse to the other." We reiterated the elements of a fraud action at law and distinguished rules governing proof of fraud at law and in equity in *Manson State Bank v. Tripp*, 248 N.W.2d 105, 107–08 (Iowa 1976). Because no fiduciary duty existed in that case, we had no occasion to determine its effect if one had existed. Nevertheless, the concept was discussed in the context of the sufficiency of the Tripps' proof of fraud rather than in terms of eliminating elements of common-law fraud or recognizing an alternative tort theory.

We do not find that the trial court's ruling in this case addressed that issue either unless it can be inferred from the court's statement that acceptance of the concept of fiduciary duty did not change the nature of the action.

█ It is necessary to determine whether plaintiffs presented their present contention to the trial court and obtained a ruling on it because otherwise error was not preserved. A trial court may not be put in error unless the issue was presented for ruling, and the failure to obtain a ruling is inexcusable unless the court refuses or fails to rule after a ruling is requested. *See, e. g., Fjelland v. Wemhoff*, 249 N.W.2d 634, 638 (Iowa 1977) ("Fjelland did not ask the trial court to enlarge its findings and rule upon his second basis for recovery. See Rule 179(b), Rules of Civil Procedure. Therefore Fjelland presents nothing for review.").

█ After review of the record, we do not believe the trial court was ruling on the present contention of plaintiffs when it held that despite the existence of fiduciary duty

the action remained one for common-law fraud. From their opening statement through their post-trial reply brief, plaintiffs relied solely on their fraud theory. Moreover, they did not file a rule 179(b) motion asking for a ruling on their present theory although they filed such a motion on an unrelated subject.

In his opening statement, attorney Riley said:

> Your Honor, it's the contention of the Plaintiffs . . . that Ralston-Purina Company obtained 100% control of a resort in Colorado by *fraud* consisting of outright misrepresentations, half-truths communicated to the Plaintiffs and breach of fiduciary duty by concealment of valuable information.

(emphasis supplied). As to the significance of the fiduciary duty concept, he said:

> This fiduciary relationship, your honor, required Ralston-Purina to share all relevant information with the Plaintiffs so that the Plaintiffs could make up their own minds and not have their minds made up for them by Ralston-Purina. They failed to do it in the instances that I have indicated and we submit that *this constitutes fraud.*

(emphasis supplied).

In anticipation of a jury trial, before the decision to waive a jury was made, the parties submitted proposed jury instructions. In their statement of the issues, plaintiffs characterized their claim as follows: "They allege that the Defendant Ralston Purina Company acquired their stock in Keystone *by fraudulent means* and that they are entitled to an award against the Defendant Ralston Purina Company for actual and punitive damages." (emphasis supplied). In their marshalling instruction, they included only the elements of common-law fraud. As to the effect of fiduciary duty, they proposed an instruction which referred only to a shifting of the burden of proof of fraud:

> Where one party to the transaction owes a fiduciary duty to the other and it deals from superior knowledge and overmastering influence obtained from the fiduciary

relationship, unfair advantage is rendered probable and thus *the burden of proof is shifted* to the party owing the fiduciary duty to show affirmatively that no deception was practiced in the transaction and that all was fair, open, and well understood. If the party owing the fiduciary duty succeeds in producing proof to show that it did not take advantage or abuse its position of superior knowledge and overmastering influence, *the party alleging fraud has the ultimate burden of proof to establish such allegation, and must resume the burden of proving fraud.*

(emphasis supplied).

In their trial brief, plaintiffs characterized the significance of fiduciary duty as follows:

> This fiduciary relationship affects this case in a number of ways. Not only does it impose on Ralston Purina a higher duty of disclosure, it also has a bearing upon the allocation of the burden of proof in this case, justifies a greater degree of reliance on what Ralston Purina said—and didn't say, and also affects the damage remedies available to plaintiffs.

Repeatedly, they characterized the action as based on fraud or "fraudulent breach of fiduciary duty." All references to the elements of the claim were to the elements of common-law fraud. In their opening post-trial brief they renewed the contentions of their trial brief, summarizing them as follows:

> 1. Once the fiduciary relationship is established the burden of persuasion (as opposed to the burden of going forward) shifts to and remains with the fiduciary.
>
> 2. The fiduciary must establish by clear, satisfactory, and convincing evidence that it acted in good faith and that the grantor or transferor acted on the basis of full information.

They also incorporated these arguments in their post-trial reply brief.

We find no contention in the trial court that recovery may be had for breach of fiduciary duty despite absence of scienter or

intent to deceive either on a theory that the existence of fiduciary duty eliminates those elements from a fraud claim or that an independent tort exists for breach of fiduciary duty.

The trial court accepted and applied the principles of law advocated by plaintiffs in the trial court. We do not decide whether it was compelled to do so nor do we decide the merits of the contention which is made for the first time here.

We reject that contention on the basis that it was neither presented nor ruled on in the trial court. We reject plaintiffs' present invocation of the "fairness doctrine" on the same basis.

II. *The ruling on evidence.* While examining Keystone files during the process of discovery, attorney Riley found a twenty-nine page memorandum which the record establishes had been written by counsel for Ralston, containing a chronological listing of historical data relating to the merger developed by counsel as of the date of the memorandum.

Plaintiffs offered this memorandum and an excerpt from it as evidence at trial. After considerable preliminary discussion and after a defense objection alleging "there is no proper foundation; it's incompetent, irrelevant and immaterial" and the attorney-client privilege, the trial court sustained defendants' objection to the exhibits.

The statement in the memorandum which plaintiffs contend helps their case is this: "February, 1972—Craig Nelson buys 3,000 shares at $3.00 a share as this is what Bergman says the shares are worth." The record separately showed without dispute that Craig Nelson, assistant treasurer and accountant for Keystone, purchased 25,000 shares of the first issue and 24,500 shares of the second. He then purchased 3,000 shares from Don Houpt in December 1972 for $3.00 a share. In response to the October 1973 tender offer he tendered all of his stock and received payment. Despite having received $3.00 per share in the December 1972 transaction, Houpt also accepted the tender offer.

In their appellate brief, plaintiffs allege the statement "was offered for the purpose of impeaching the testimony of Bergman and Nelson, both of whom testified that they had no discussion with each other as to the value of Keystone stock prior to Nelson's purchases, and of showing the value of Keystone's stock." Even though the statement was not in evidence, Bergman was questioned about it. Attorney Riley said: "There is a memorandum that I say at Keystone when I was out there last week, Bill; it states that Nelson paid Haupt $3.00 a share because that's what Bergman told him it was worth. Did you have a conversation with Craig Nelson at the time he purchased the stock from Don Houpt?" Bergman responded, "No, sir." He said Nelson received the information from Steve Nelson, a law partner of Bergman, but Bergman had in fact told Steve Nelson he had no idea what the value was. Craig Nelson confirmed in his testimony that Bergman had not expressed any opinion to him about the value of the stock.

In seeking to have the exhibits containing the statement admitted, counsel for plaintiffs acknowledged that the reference in the statement to Bergman's view of the value of the stock did not mean that Bergman had expressed his view to Craig Nelson.

Nelson testified he thought in December 1972 that the $3.00 per share price was fair, but he changed his mind by the time the tender offer was made because Keystone's financial situation had deteriorated in the interim. The company lost more than $700,000 during the fiscal year ending May 31, 1973, and the prospects for getting additional capital were dim. Bergman testified extensively concerning his view that the price offered in the tender offer was fair, and he was thoroughly cross-examined.

In its findings of fact, the trial court found that neither Craig Nelson nor Houpt treated the December 1972 transaction as indicative of the value in October 1973. The court accepted Bergman's view that the tender offer would provide minority shareholders the opportunity to avoid the risk of future loss and sell their stock "at a fair price and substantial profit."

When an objection to evidence is sustained, "the trial court ruling will be upheld

on appeal if the evidence could be held inadmissible on any theory, whether urged in the objection or not." *Porter v. Iowa Power & Light Co.*, 217 N.W.2d 221, 231 (Iowa 1974).

■ In this situation, assuming the exhibits would otherwise be admissible, we believe that the trial court ruling can be sustained on relevancy principles, a ground which was specifically urged by defendants. The basic test of relevancy is whether the evidence would make the desired inference more probable than it would be without the evidence. The question is a matter for exercise of trial court discretion. *Kalianov v. Darland*, 252 N.W.2d 732, 735 (Iowa 1977). Even when evidence has some probative value, the trial court has discretion to exclude it "when its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." *Id.* at 736.

■ Here the December 1972 transaction was fully disclosed by other evidence. Bergman and Nelson were cross-examined about the information in the statement. No issue was raised concerning whether the memorandum in fact contained the statement. Bergman's views about the value of the stock were thoroughly tested by vigorous cross-examination. The trial court could reasonably conclude that any probative value of the exhibits was substantially outweighed by its cumulative nature. We uphold the court's ruling on relevancy principles.

III. *The short-form merger procedure.* Plaintiffs allege the trial court erred in holding that "the short form merger proceedings in 1974 accorded to the provisions of the Iowa statutes and [were] not the culmination of a fraudulent scheme." They assert that defendants failed to comply with statutory procedures, misstated the availability of the appraisal remedy, and violated a general and overriding duty of full disclosure to remaining minority stockholders by failing to update tender offer disclosures.

Under section 496A.78, dissenting shareholders have an appraisal remedy when they do not wish to give up their stock at the price offered in merger proceedings. Defendants contend this remedy is exclusive. We will assume, without deciding, that it is not. *See generally* Vorenberg, *Exclusiveness of the Dissenting Stockholder's Appraisal Right*, 77 Harv.L.Rev. 1189 (1964); Note, *Merger and Consolidation in Iowa*, 34 Iowa L.Rev. 67, 78–79 (1948).

■ We will assume, without deciding, that defendants did violate section 496A.78 in the respects claimed and that the trial court was wrong in holding otherwise. Because this case was tried on a theory of fraud, it would not be enough for plaintiffs merely to prove the violations. They had to satisfy the trial court that they were fraudulent. The trial court's holding that the short-form merger proceedings were not fraudulent means that any violations of section 496A.78 do not constitute a basis for recovery in this case.

We find no reversible error.

AFFIRMED.

All Justices concur except REYNOLDSON, C. J., who takes no part.