Phyllis SANDERS, Plaintiff,

v.

THRALL CAR MANUFACTURING COMPANY; Arthur M. Barrett, Jr.; Thomas J. Boyce, Jr.; John J. Bergstrom; Stanley D. Christianson; Richard Duchossois; George F. Gerk, Sr.; Robert H. Hayes; Paul T. Kessler, Jr.; James L. Krum; Ralph Schultz; Joseph V. Scott; John P. Sommers; and Chamberlain Manufacturing Corporation, Defendants.

No. 79 Civ. 4292–CSH.

United States District Court,
S.D. New York.

Sept. 16, 1983.

948

Avrom S. Fischer, Brooklyn, N.Y., for plaintiff.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants Thrall Car Mfg. Co., Barrett, Christianson, Duchossois, Gerk, Hayes, Scott and Chamberlain Mfg. Corp.; Lewis A. Kaplan, Harriet L. Goldberg, New York City, of counsel.

Parker, Auspitz, Neesemann & Delehanty, New York City, for defendants Boyce, Bergstrom, Kessler, Krum, Schultz and Sommers; Charles S. Barquist, Jack C. Auspitz, New York City, of counsel.

HAIGHT, District Judge:

Plaintiff Phyllis Sanders, a former minority shareholder of defendant Chamberlain Manufacturing Corporation ("Chamberlain"), brings this action to redress alleged violations of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, arising out of events preceding defendant Thrall Car Manufacturing Company's ("Thrall") 1979 tender offer for Chamberlain shares. Also named as defendants are Chamberlain and the individual members of its board of directors at the time of the disputed transaction. The case is presently before the Court on defendants' motion to dismiss the second amended complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (6) and plaintiff's motion for leave to amend the complaint to assert an additional claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.* For the reasons stated below, plaintiff's motion is denied and defendants' motion to dismiss is granted.

## I.

*Factual Background*

At the time of the events giving rise to this suit, Chamberlain Manufacturing Corporation was a publicly owned Iowa corporation engaged primarily in the manufacture and sale of electronic, home improvement, and forging and machining products. Thrall Car is a privately held Delaware corporation engaged in the manufacture, assembly, and repair of railroad freight cars and, through various subsidiaries, in the leasing of railroad freight cars and the repair of railroad rolling stock and other equipment. All Thrall Car common stock is owned beneficially by the families of Jerome A. Thrall and defendant Richard L. Duchossois; all outstanding shares of preferred stock are owned by Mildred E. and Arthur J. Thrall, parents of Jerome Thrall.

Prior to January 1977, when Thrall first purchased shares in Chamberlain, Thrall held discussions with certain Chamberlain officers and directors concerning Thrall's potential interest in acquiring control of the company. (Offer Booklet, Def.Exh. 1 at B–19). Defendants state that such discussions were terminated prior to any actual purchase of shares and that "it was not until August 1978 that [Thrall] formed a definite intention to acquire control." *Id.* Between January 10, 1977 and April 6, 1979, Thrall acquired approximately 53.8% of Chamberlain's common stock through a series of some thirty different purchase transactions. (*Id.* at B–30; Comp. ¶ 7).[1] As stated in the informational materials ("Offer Booklet") accompanying Thrall's subsequent tender offer:

"Such Shares were purchased for investment, and such purchases were not made for the purpose of acquiring control of the Company. Throughout that period,

---

1. Hereinafter, citations in the Opinion to "the complaint" refer to plaintiff's second amended complaint.

however, the Purchaser consistently stated (i) that it might (and probably would) purchase additional Shares, and (ii) that it intended regularly to review its position in the Company and might (a) increase or decrease its holdings of Shares, and/or (b) seek to acquire control of the Company." *Id.* at B–19.

In July of 1977, Thrall indicated to Chamberlain its intention to seek representation on Chamberlain's board of directors. At the request of Thrall, the board subsequently voted to increase its membership from twelve to fourteen directors, and immediately thereafter elected ·defendants Duchossois and Christianson, Thrall's president and vice-president of finance, respectively, to fill the vacancies thereby created (*Id.* at B–20; Comp. ¶ 10). On April 10, 1978, Thrall announced that it intended to expand its representation on the board. Shortly thereafter, the directors voted 12 to 2 to return to a twelve-member board, effective at the 1978 annual meeting, and to recommend as part of management's slate three individuals nominated by Thrall: defendants George F. Gerk, a financial consultant to Thrall; Robert H. Hayes, a Thrall director; and Arthur M. Barrett. Two directors voted against, and one director abstained from voting on, the proposal to increase Thrall's representation from two directors to five. All five Thrall candidates were elected to the Chamberlain board at the 1978 annual meeting, and were reelected in 1979 (*Id.* at B–20).

Prior to the 1979 annual meeting, Chamberlain mailed proxy statements to all shareholders regarding two matters to be voted on at the meeting: the election of directors and a proposed merger of Chamberlain with one of its wholly owned subsidiaries, a Delaware corporation (Def.Exh. 2). The intent and effect of such a merger,

known as a "migratory" merger, would be to change Chamberlain's state of incorporation from Iowa to Delaware. Both the merger and management's slate of directors, the party defendants in this action, were approved at the annual meeting. The new board elected Richard Duchossois to the position of chairman of the board.

On August 14, 1979, Thrall announced publicly its intention to make a tender offer for all outstanding shares of Chamberlain common stock at a price of $26.50 per share (Exh. 3), subject to completion of the necessary filings with the Securities and Exchange Commission and compliance with applicable state securities laws.[2] The offer itself commenced on August 27, 1979 at a price of $30.00 per share (Offer Booklet, Def.Exh. 1 at B–1). In the Offer Booklet, Thrall stated that its attempt to acquire the entire equity interest in Chamberlain at this time was prompted by shareholder approval of the proposed migratory merger. More specifically, Thrall expressed concern over the right of dissenting shareholders under Iowa law to demand payment of the fair value of their shares and the consequent reduction in corporate assets occasioned by such cash payments. Thrall viewed the effects of a migratory merger as inconsistent with its own objectives and determined that it would be in Thrall's best interests to initiate a tender offer which, if successful, would set the stage for a merger of Chamberlain and a Thrall subsidiary.

Abandonment of the migratory merger would also benefit Thrall in two other respects. As stated in the Offer Booklet:

"[S]ince the Purchaser presently intends to cause the Company to be merged with the Purchaser or to become a wholly-owned subsidiary of the Purchaser ..., abandonment of the migratory merger

---

**2.** Under Iowa's Uniform Securities Act, Iowa C.Ann. § 502.214(3), Thrall was required to disseminate generally the information to be included in its tender offer. The pertinent provision reads as follows:

"502.214 Provisions applicable to tender offer registration generally. * * *

"3. The administrator may by rule or order require as a condition of registration under

this Act that all or a part of the information contained in the tender offer registration statement be made publicly available, either prior or subsequent to the registration statement becoming effective, by publication in one or more newspapers of appropriate circulation or be made available to stockholders via a mailing to stockholders."

would ... avoid the expense (and possibly inconsistent results) of simultaneous appraisal proceedings in two separate jurisdictions (i.e., Iowa as to the migratory merger and Delaware as to the subsequent merger with the Purchaser or a subsidiary of the Purchaser which the Purchaser intends to propose). Moreover, a cash merger following migration to Delaware would involve a risk to the Purchaser which it does not believe will be encountered if the Company remains in Iowa. The Supreme Court of Delaware has held that the merger of a Delaware corporation caused by its majority stockholder solely for the purpose of compelling the minority stockholders to relinquish their shares in exchange for a cash payment is a violation of a fiduciary duty owed by such majority stockholder to the minority, even though all statutory requirements of Delaware law relating to mergers have otherwise been met.... [Given] the normal uncertainties of litigation, the Purchaser could not be assured that a subsequent merger would, if challenged in the Delaware courts, ultimately be sustained by such courts. So far as Purchaser has been able to determine, there are no holdings by Iowa courts which are similar to the Delaware decisions referred to above.

"In addition, participation by the Company in any merger (including the migratory merger) would require that the Company obtain the consents of certain creditors of the Company and, possibly, the consents of parties to other contracts with the Company; and, in light of the Purchaser's present plans discussed below to propose a merger of the Company with the Purchaser or with a wholly-owned subsidiary of the Purchaser (see 'Effects of the Offer'), the obtaining of such consents incident to the migratory merger would involve efforts (and might involve financial inducements) which might have to be duplicated in the near

future. The Purchaser wishes to avoid such duplication." (Def.Exh. 1 at B–3–B–4).

On September 6, 1979, Chamberlain's board of directors, noting the pendency of the Thrall tender offer, declared the merger proposal "terminated and null and void." (Palermo Aff., Def.Exh. 4).

Response to the tender offer was extremely positive. Pursuant to the offer, and in transactions subsequent to its termination, Thrall purchased 700,066 shares of Chamberlain common stock for a purchase price of $21,014,029.61, thereby increasing its interest in Chamberlain from 53.8 percent to approximately 98 percent (Def.Exh. 1 at 9). Plaintiff Sanders tendered 890 of the 900 shares of Chamberlain stock she owned (Comp. ¶ 60). On January 30, 1980, proxies were solicited from Chamberlain shareholders for approval of a merger between Chamberlain and New–C–Corp ("NCC"), a wholly owned subsidiary of Thrall. The accompanying proxy statement described the right of dissenting shareholders to make a written demand upon the company for payment of the fair value of their shares and the tax consequences of so doing, and described the instant suit filed by plaintiff Sanders and another action filed on behalf of all Chamberlain shareholders against Thrall in the Circuit Court of Cook County, Illinois, Chancery Division (Def.Exh. 1 at 12–16).[3] At the time of this solicitation, NCC, as successor to Thrall, owned beneficially 1,554,426 shares of the 1,587,418 Chamberlain shares outstanding. Given that NCC owned 98 percent of the voting shares and approval of the plan required affirmative votes from holders of at least two-thirds of those shares, approval of the merger was a certainty. Of the 26,215 shares held by entities other than NCC, 2,915, or approximately 11 percent, were voted against the merger and 23,300 were voted in favor of the plan. No shares registered in plaintiff's name were voted against the merger,

---

**3.** The Illinois suit, *Ziskin v. Thrall Car Manufacturing Co.,* was dismissed by the Circuit Court of Cook County for failure to state a cause of action, a decision affirmed by the Appellate

Court of Illinois, First Judicial District. *See Ziskin v. Thrall Manufacturing Co., et al.,* 106 Ill.App.3d 482, 62 Ill.Dec. 255, 435 N.E.2d 1227 (1982).

and she did not seek appraisal under Iowa law in connection with the merger (Palermo Aff. ¶ 2). On March 17, 1980, Thrall, now the sole owner of record of all outstanding Chamberlain shares, elected defendants Barrett, Boyce, Bergstrom, Duchossois, Christianson, Gerk, Hayes, Kessler, Krum, Schultz, and Sommers to serve as directors of the corporation.

## II.

*Plaintiff's Motion to Amend*

Essential to a determination of plaintiff's motion to file a third amended complaint in this action is a brief review of the proceedings to date. Plaintiff's first complaint was filed on August 16, 1979, prior to Thrall's August 27, 1979 tender offer but immediately after Thrall publicly announced its intention to make the offer. The initial complaint alleged generally that Thrall had engaged in an effort to artificially depress the price of Chamberlain stock so as to obtain shares at a reduced price. Plaintiff challenged both the 1979 Chamberlain board of directors election and shareholder approval of the migratory merger.

In late October 1979, while defendants were in the midst of preparing a motion to dismiss the original complaint, plaintiff filed a first amended complaint containing new factual allegations and adding several causes of action based, in large measure, on information gleaned from the Offer Booklet accompanying Thrall's August 27, 1979 tender offer. Defendants allege that although plaintiff "was aware that defendants were expending considerable time and effort in preparing a motion to dismiss, they were given no advance notice of plaintiff's intention to amend (Def.Mem. in Opp. at 3). Confronted with a materially altered complaint, defendants once again commenced preparation of motion papers responsive to the new pleadings.

On December 7, 1979, "after defendants had largely completed new motion papers," *id.*, plaintiff requested leave to again amend the complaint to allege that plaintiff had tendered 890 of her 900 Chamberlain shares in response to Thrall's offer. Defendants strongly opposed a continuation of "plaintiff's ever-shifting pleadings" and averred that plaintiff's conduct, "by design or negligence, has imposed unwarranted burdens on defendants." (Kaplan Aff. at ¶ 2). This Court, noting that the parties were sharply divided on the question of whether plaintiff was actually aware of the imminence of defendants' motion to dismiss, chose to accept plaintiff's representation that the proposed amendment was not prompted by dilatory motives, but rather was occasioned by an oversight on the part of plaintiff's counsel. However, in granting leave to file a second amended complaint, I concluded with the following admonition:

> "In light of the history of this case, we may well have reached—as defendants urge—'the time [which] must arrive at some stage of every litigation when plaintiff must be required to stand upon the allegations he is asserting...' *Bernstein v. N.V. Nederlandsche-Amerikaansche Stoomvaart Maatschappij*, 79 F.Supp. 38, 42 (S.D.N.Y.1948), *modified on other grounds*, 173 F.2d 71 (2d Cir. 1949). Although I am not willing to preclude formally any further amendments, I do embrace Judge Ryan's statement in *Bernstein, supra.*" (Op. at 7).

In a motion presently before the Court, defendants moved to dismiss the second amended complaint. Plaintiff's papers in opposition were served some eleven months later on August 14, 1981 and defendants' reply papers on January 26, 1982. Shortly thereafter, plaintiff sought leave to file a third amended complaint based on identical facts but now alleging a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, "in connection with the purchase of defendants in two stages of the shares of Chamberlain Manufacturing Corporation...." (Fischer Aff. at 1). Defendants vigorously oppose any further amendment to plaintiff's complaint that would once again put them to the task of revising their pending motion to dismiss and characterize

the effort as "a last-ditch attempt" on plaintiff's part "to postpone dismissal of her suit." (Def.Mem. in Opp. at 20).

Fed.R.Civ.P. 15(a) requires that leave to amend "be freely given when justice so requires," an adjuration that has been construed by the Supreme Court as follows:

"If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

Stated simply, a court should exercise its Rule 15(a) discretion liberally to permit amendment of pleadings, except where the rule's salutary objective of encouraging disposition of litigation on the merits is outweighed by equally compelling policy considerations. Defendants argue persuasively that "this case abounds with such reasons" (Def.Mem. in Opp. at 5), including plaintiff's excessive delay in asserting an additional cause of action and her repeated failure to cure this alleged deficiency in previous amendments. While a court may not properly deny an amendment solely on the ground of delay, where, as here, "a considerable period of time has passed between the filing of the complaint and the motion to amend, courts have placed the burden upon the movant to show some 'valid reason for his neglect and delay.'" *Hayes v. New England Millwork Distributors, Inc.*, 602 F.2d 15, 19–20 (1st Cir.1979), *quoting Freeman v. Continental Gin Co.*, 381 F.2d 459, 469 (5th Cir. 1967). *See also Gregory v. Mitchell*, 634 F.2d 199, 203 (5th Cir.1981); *Roorda v. American Oil Co.*, 446 F.Supp. 939, 947 (W.D.N.Y.1978). After considering plain-

tiff's proffered reasons, I do not find that this burden has been met.

The only explanation counsel for plaintiff offers for failing to assert a RICO cause of action in the initial complaint or in two successive amended complaints, pleadings which spanned a period of two and one-half years, is ignorance of the statute:

"A claim for relief under RICO was not previously asserted in the complaint because I was not familiar with this act until December 21, 1981. I do not have total command of all 50 titles of the United States Code. I did not learn of RICO until *Aetna Casualty v. Liebowitz*, (E.D.N.Y. 81 Civ. 2616, December 8, 1981), was reported on the front page of the New York Law Journal on December 21, 1981 and a case called *Spencer Companies Inc. v. Agency Rent-A-Car Inc.* was reported at page A2 in issue number 633 of the BNA Security Law and Regulation Report which I received that same day." (Fischer Aff. at 2).

The Court of Appeals for the Sixth Circuit, confronted with a similar explanation for delay—i.e., that plaintiff became aware of a particular statute's potential as an alternative ground for relief only after filing the complaint—held that the district court had not abused its discretion in denying plaintiff's motion to amend. *Head v. Timken Roller Bearing Co.*, 486 F.2d 870, 875 (6th Cir.1975). While the plaintiff in *Head* contended that the discovery of "new law" justified his delay in seeking an amendment, the Court found that the statutory cause of action proposed was "new" only in the sense that plaintiff had been unaware of it, an insufficient ground for delay. *Id.* at 874–75. Citing to *Head*, the Second Circuit noted that where plaintiff "advances no reason for his extended and undue delay other than ignorance of the law; such a failure has been held an insufficient basis for leave to amend." *Goss v. Revlon, Inc.*, 548 F.2d 405, 407 (2d Cir. 1976), *on remand*, 16 FEP Cases (BNA) at 44 (S.D.N.Y.1966), *aff'd*, 556 F.2d 556 (2d Cir.), *cert. denied*, 434 U.S. 968, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977).

In the instant action, the statute in question was enacted in 1970, almost a decade before this suit was commenced, and plaintiff has had two opportunities subsequent to the initial filing to remedy any perceived deficiencies in the complaint. As strongly suggested to plaintiff in this Court's prior Opinion, the liberality with which a court grants leave to amend does not impart to litigants the privilege of re-shaping their legal theories endlessly, even where there is no evidence of improper motive or dilatory objectives. "While we must give a party a fair chance to present claims and defenses, we also must protect 'a busy district court [from being] imposed upon by the presentation of theories seriatim.'" *Daves v. Payless Cashways*, 661 F.2d 1022, 1025 (5th Cir.1981), *quoting Gregory v. Mitchell, supra*, 634 F.2d at 203. *Cf. Rhodes v. Amarillo Hospital Dist.*, 654 F.2d 1148, 1154 (5th Cir.1981) ("The retention of a new attorney able to perceive or draft different or more creative claims from the same set of facts is itself no excuse for the late filing of an amended complaint."). Accordingly, I deny plaintiff's motion to amend and turn now to a consideration of defendants' motion to dismiss the second amended complaint.

## III.

### Defendants' Motion to Dismiss

[4, 5] Before addressing the specific issues raised by defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) and (6), I note preliminarily that, in ruling upon a motion to dismiss for failure to state a claim, this Court is obligated to accept as true all well-pleaded allegations of the complaint. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). This Court is further mindful of the well-established rule that a complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). *See Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir.1980). Although each of plaintiff's various claims for relief reiterates substantially the same conduct on defendants' part and reflects plaintiff's general disappointment over the tender offer and her apparent conviction that defendants engaged in a scheme to "freeze out" Chamberlain's minority shareholders, each asserts a different violation of the securities laws and will be considered seriatim.

### A. First and Second Claims for Relief

Plaintiff alleges in her first and second claims for relief that the 1978 and 1979 Chamberlain board of directors elections and the authorization of a migratory merger in 1979 were achieved through the use of misleading proxy statements in violation of § 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a) [hereinafter § 14a],[4] and Rule 14(a)–9, 17 C.F.R. § 240.-14(a)–9,[5] promulgated thereunder. The

---

**4.** Section 14(a) provides:
"Solicitation of proxies in violation of rules and regulations
"(a) It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 781 of this title."

**5.** Rule 14(a)–9 provides:

"§ 240.14a–9 False or misleading statements.
"(a) No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

specific allegations in the complaint common to these counts and others describe the steps allegedly taken by defendants in pursuit of a "long-standing plan to freeze out Chamberlain's minority shareholders" (Pl.Mem. in Opp. at 5) and thereby acquire the company at an artificially depressed price. Because these allegations are central to each of the causes of action asserted, a brief review of plaintiff's version of events is in order.

According to plaintiff, Thrall's takeover scheme commenced prior to January 1977 when Thrall concededly expressed an interest in acquiring control of Chamberlain in discussions held with certain officers and directors of the company (Offer Booklet at B–19). While defendants contend that such discussions were tabled prior to Thrall's initial purchase of Chamberlain stock in January of 1977 and that Thrall's interest in acquiring control of Chamberlain was not rekindled until August of 1978, *id.*, plaintiff views Thrall's steady accumulation of Chamberlain stock in the period from January 1977 to July of 1977, when Thrall first requested and was given representation on Chamberlain's board of directors, as indicative of Thrall's unwavering intent to obtain control of the company (Pl.Mem. in Opp. at 12–13).

Plaintiff further contends that defendants Duchossois and Christianson, as directors of Chamberlain, became privy in 1977 to otherwise undisclosed information regarding Chamberlain's future profitability. More specifically, Thrall would have access to information concerning Mason-Chamberlain, Inc. ("MCI"), a joint venture formed by Chamberlain and Mason & Hanger-Silas Mason Co., Inc., a Kentucky corporation. In August of 1976, MCI was awarded a cost-reimbursable contract in connection with the construction and eventual operation of a government munitions facility in St. Louis, Mississippi, a facility

that could ultimately generate substantially increased profits for Chamberlain (Comp. ¶¶ 20–24). Plaintiff contends that by failing to release data regarding the Mason-Chamberlain project and Thrall's alleged plan to acquire control of Chamberlain, the price of Chamberlain's publicly traded stock was improperly manipulated and artificially depressed (Comp. ¶ 23; Pl. Mem. in Opp. at 14). Plaintiff further contends that Thrall's continued acquisition of Chamberlain stock subsequent to the appointment of Messrs. Duchossois and Christianson to the board of directors, purchases countenanced by the Chamberlain board, constitutes a breach of defendants' fiduciary duty to Chamberlain and its shareholders (Comp. ¶ 28). In sum, plaintiff argues that Thrall exploited its access to information regarding MCI, as well as Chamberlain's internal income and sales projections, to trade in Chamberlain stock while preventing disclosure of inside information that could increase the market value of Chamberlain shares. (Comp. ¶¶ 26–29).

Plaintiff also alleges that Chamberlain's sale of its Manlift division in April of 1979 "was motivated by a plan to raise cash to ultimately be used to finance the purchase of the shares of the minority stockholders at artificially low prices...." (Comp. ¶ 33), and that Chamberlain changed its accounting system in April of 1978 in order to effect an apparent decline in its reported earnings per share and income from continuing operations for the year ending March 31, 1979 (Comp. ¶ 34).

On the basis of these various occurrences, plaintiff alleges that the proxy statement soliciting proxies for the election of the 1978 board of directors was "false and misleading" in that it failed to disclose the elements of defendants' purported "conspiracy ... to have Thrall takeover Chamberlain and force out the minority share-

"(b) The fact that a proxy statement, form of proxy or other soliciting material has been filed with or examined by the Commission shall not be deemed a finding by the Commission that such material is accurate or complete or not false or misleading, or that the Commission has passed upon the merits of or approved any statement contained therein or any matter to be acted upon by security holders. No representation contrary to the foregoing shall be made."

holders for less than adequate consideration." (Comp. ¶ 37). The election of directors supportive of Thrall's endeavor was, according to plaintiff, "an essential element of the scheme" (Comp. ¶ 39), and defendants' failure to identify five of the candidates as "Thrall nominees" was therefore a material omission (Comp. ¶ 37(e)). In sum, plaintiff contends that her "right to receive a complete and truthful proxy statement" was violated (Comp. ¶ 42) and seeks to void the 1978 election (Comp. ¶ 41). For substantially the same reasons, plaintiff seeks in her second cause of action to void both the 1979 board of directors election and shareholder approval of a migratory merger between Chamberlain and one of its subsidiaries, a Delaware corporation.

Defendants move to dismiss, pursuant to Fed.R.Civ.P. 12(b)(1), both the first and second causes of action as moot, arguing that the terms of the directors elected in the 1978 and 1979 elections have expired and the proposed migratory merger has been altogether abandoned (Def.Mem. at 10–12). Aside from the question of justiciability, defendants contend that plaintiff's alleged injury is "simply too remote from the challenged elections to be actionable under section 14(a)." (Def. Reply Mem. at 4).

A necessary predicate to this Court's assertion of jurisdiction is, of course, a viable, continuing, and therefore justiciable controversy between the litigants. *North Carolina v. Rice*, 404 U.S. 244, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971). Where, as here, plaintiff challenges the solicitation of proxies for the election of directors to a term now complete, courts addressing the question of mootness have looked to the nature of the relief sought. In *Browning Debenture Holders' Committee v. DASA Corp.*, 524 F.2d 811 (2d Cir.1975), plaintiffs, arguing that § 14(a) must be construed liberally to effectuate its intended purpose as a mechanism for private policing of the securities market, *see J.I. Case Co. v. Borak*, 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964), sought to invalidate a prior stockholder meeting on the ground that the

proxies used therein were fraudulently solicited. The officers elected at that meeting had completed their terms of office and subsequent elections had been held. In affirming the lower court's dismissal of plaintiff's claim as moot, the Court of Appeals for this Circuit rejected the suggestion that the broad prophylactic purposes underlying § 14(a) mandated the declaratory relief plaintiffs sought—i.e., a declaration that a now superseded election had been conducted illegally. Noting that plaintiffs had failed to specify in their complaint "monetary damages or other operative relief," the Court held that where "the remedy sought is a mere declaration of law without implications for practical enforcement upon the parties, the case is properly dismissed." *Browning, supra,* 524 F.2d at 817. *See also Maldonado v. Flynn,* 597 F.2d 789, 797 n. 10 (2d Cir.1979) ("The terms of those elected in 1975 have expired, rendering moot the question of the validity of the election..."); *Kamerman v. Pakco Companies, Inc.,* [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,318, 93066 (S.D. N.Y.1978) ("Since ... the Court, under the aegis of Section 14, could not fashion relief other than to void the past elections, all of which are now moot, ... the action, even if successful, would prove to be futile."); *Herman v. Beretta,* [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,574, 94,409 (S.D. N.Y.1978) ("courts will not seek to perform an act that is an obvious nullity: voiding the election of directors whose terms have already expired").

The rationale of *Browning, supra,* however, does not extend to instances where plaintiff seeks injunctive versus declaratory relief, or, in short, where plaintiff "seeks not only to eliminate the effect of past wrongdoing, but also to prevent its recurrence." *Siebert v. Sperry Rand Corp.,* 586 F.2d 949, 951 (2d Cir.1978). In *Siebert,* the mootness issue arose only on appeal and as a natural consequence of the inevitable lapse of time between a district court's determination and appellate review. The individual director whose election plaintiff challenged in *Siebert* held office at the time the complaint was filed and, in-

deed, at the time plaintiff appealed the lower court's dismissal on the ground that the omissions complained of were not material facts, as that term has been construed in the § 14(a) context. However, prior to a final appellate disposition on the materiality issue, the director's one-year term of office lapsed and he was re-elected in a new election. Because the plaintiff in *Siebert* explicitly sought to enjoin the challenged director "from sitting on the Sperry board unless and until he shall be elected thereto pursuant to a proper and lawful shareholder vote," the Second Circuit properly found the asserted claim to have ongoing validity and the controversy between the parties to be "alive up to the final moment of appellate disposition." *Id.*

■ Plaintiff's attempt to skirt the plain language of *Browning* by way of a belated assertion of pecuniary harm (Pl.Mem. at 59) and by seeking shelter in the "equitable relief" embrace of *Siebert* must fail. Nowhere in plaintiff's first and second claims for relief does she "specify monetary damages," as required by *Browning*, 524 F.2d at 817; rather, the clear intent is to obtain a declaration of invalidity as to the 1978 and 1979 board of directors elections on the theory that plaintiff's "right to receive a complete and truthful proxy statement was violated." (Comp. ¶¶ 41–42, 49, 50). Nor can it be said that the kind of affirmative injunctive restraint sought by the plaintiff in *Siebert, supra,* is asserted, or even applicable, here. What plaintiff fails to perceive is that the "operative relief" envisioned by the Second Circuit in *Browning,* and found to be present in *Siebert,* requires that the relief sought can be practically and actually enforced upon the parties. A determination by this Court that the elections in question contravened the proxy solicitation requirements of § 14(a) would be "a mere declaration of law," *Browning, supra,* 524 F.2d at 817, a finding insufficient to ground this Court's as-

sumption of jurisdiction. This conclusion applies even more forcefully to the migratory merger, a shareholder-approved plan that was subsequently abandoned by defendants.

Plaintiff would argue, no doubt, that this analysis is excessively myopic and fails to grasp the thrust of plaintiff's claim—i.e., that the election of directors amenable to Thrall's takeover objective was an essential step in effecting the injury complained of here, a "freeze-out" of minority shareholders. To first note the obvious, after the disputed 1978 and 1979 elections, only five of the twelve Chamberlain directors were Thrall nominees. As the Illinois Appellate Court observed in *Ziskin v. Thrall Car Manufacturing Co.,* 106 Ill.App.3d 482, 488, 62 Ill.Dec. 255, 260, 435 N.E.2d 1227, 1232 (1982):

> "Because Chamberlain had a directorate of twelve, it follows Thrall could not control a majority of the board of directors and needed acquiescence by independent directors. This fact tends to negate any inference of a conspiracy against the interests of the minority shareholders of Chamberlain."

■ Even if I were to find that, once in office, the Thrall nominees were able to exercise their will over a tractable Chamberlain board, and that the alleged omissions of fact in the proxy solicitations were "material" as that term has been construed under the securities laws,[6] a question I do not decide, plaintiff still must make "a sufficient showing of causal relationship between the violation and the injury for which [she seeks] redress...." *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 385, 90 S.Ct. 616, 622, 24 L.Ed.2d 593 (1970). Such a nexus is demonstrated when plaintiff "proves that the proxy solicitation itself ... was an essential link in the accomplishment of the transaction" giving rise to the litigation, *id.,* a test that Judge Oakes

---

**6.** In *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976), the Supreme Court defined an omission as material if there was "a substantial likelihood that ... disclosure of the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." *See also Prudent Real Estate Trust v. Johncamp Realty, Inc.,* 599 F.2d 1140 (2d Cir.1979).

has termed the "transaction causation" requirement. *See Schlick v. Penn-Dixie Cement Corporation,* 507 F.2d 374, 382 (2d Cir.1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). When the challenged "transaction" is the election of directors, the transaction causation requirement is of course met, since the misleading proxy solicitation clearly resulted in the corporate transaction complained of. *See Weisberg v. Coastal States Gas Corp.,* 609 F.2d 650, 654 (2d Cir.1979); *Galef v. Alexander,* 615 F.2d 51, 65 (2d Cir.1980) (transaction causation requirement of § 14(a) is met where "the injuries of which plaintiff complains ... are the elections themselves" and "he seeks to have [them] overturned...."). The same would hold true if, for example, the proxy solicitation sought shareholder approval of a later-contested merger.

In the instant action, however, the transaction giving rise to this litigation is Thrall's tender offer and the subsequent merger of Chamberlain and NCC, a transaction only remotely related, at best, to the 1978 and 1979 board of directors elections. Plaintiff does not claim in her complaint that the Offer Booklet announcing the tender offer was misleading [7]—indeed, the "omissions" she cites were fully disclosed there—but rather that the tender offer's success was engineered by dishonest directors breaching their fiduciary duty over a period of time. Compare *Hundahl v. United Benefit Life Insurance Co.,* 465 F.Supp. 1349 (N.D.Tex.1979) (disappointed shareholders of target corporation sued contending proxy solicitation in course of tender offer violated § 14(e)). The fact that these directors may have initially gained their offices by means of misleading proxy solicitations is too attenuated a connection to support a § 14(a) claim. As stated by this Court:

"Prosecutions under Section 14(a) may properly seek to remedy only corporate actions fraudulently induced by misleading proxy statements and to obtain damages flowing directly from such misconduct [citations omitted]. This statute, however, cannot be stretched to provide for recovery for other misdeeds committed by such corporate officials not immediately related to the action engendered by the proxy statement. To hold otherwise would render Section 14 a key with which to open the doors of the federal courts to all manner of state and common law claims." *Kamerman, supra,* Fed.Sec.L.Rep. ¶ 96,318 at 93,066.

*See also Maldonado v. Flynn,* 597 F.2d 789, 796 (2d Cir.1979) ("Efforts to dress up claims of [mismanagement or breach of fiduciary duty on the part of corporate executives] in a § 14(a) suit of clothes have consistently been rejected....").

Accordingly, while this Court is fully cognizant of the broad remedial reach of § 14(a) when properly invoked, it would appear here that plaintiff's damage claims relating directly to the tender offer transaction, if sufficiently pled, represent the appropriate means of redress for the injury alleged. For the reasons stated, plaintiff's first two claims for relief are dismissed.

### B. *Plaintiff's Third Claim for Relief*

Plaintiff's third claim for relief, which defendants seek to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), seeks damages for defendant Thrall's alleged filing of a false and misleading Schedule 13D in violation of section 13(d) of the 1934 Act, 15 U.S.C. § 78m(d); Thrall's announced intention to make a tender offer for Chamberlain stock at $26.50 per share while allegedly plan-

---

7. Plaintiff's belated suggestion that defendants did not make full disclosure in the Offer Booklet (Pl. Rebuttal Mem. at 14) is not reflected in the complaint and, indeed, is inconsistent with the allegations therein. In addition to not being properly pled, the crux of the newly conceived nondisclosure argument appears to be Thrall's failure to draw attention to the fact that the information being disclosed in the Offer Booklet

was not previously disclosed. Defendants were under no obligation, however, to characterize their prior omissions pejoratively or to "draw adverse inferences from the facts disclosed. A reasonable shareholder may be required to draw his or her own inferences, whether they may be positive or negative in the circumstances of a particular case." *Issen v. GSC Enterprises, Inc.,* 508 F.Supp. 1278, 1290 (N.D.Ill.1981).

ning to offer $30.00 per share, in violation of section 14(e), 15 U.S.C. § 78n(e); and Thrall's trading in Chamberlain stock on the basis of allegedly undisclosed information in violation of section 10(b), 15 U.S.C. § 78j(b). I will consider the sufficiency of each of these claims in turn.

### a) *Section 13(d)*

The 1968 Williams Act,[8] which added § 13(d)[9] to the Securities Exchange Act of 1934, reflects congressional recognition of, and response to, the substantial regulatory gap created by the increased use of cash tender offers in corporate acquisitions. *See Piper v. Chris-Craft Industries,* 430 U.S. 1, 22, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977); *Edgar v. Mite,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). As set forth by the Court of Appeals for this Circuit, "the purpose of section 13(d) is to alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corpo-

rate control...." *GAF Corp. v. Milstein,* 453 F.2d 709, 717 (2d Cir.1971), *cert. denied,* 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972). To that end, section 13(d) requires any person who acquires more than 5 percent of a class of registered equity security to file with the issuer of the security, the exchanges where the security is traded, and the Commission a statement containing the information required by schedule 13D, 17 CFR § 240.13d–101, including the background and identity of the persons filing, the source and amount of funds used in making the purchase, the purpose of the transaction and any plans or proposals which might result in a shift in control of the issuer corporation, the number of shares owned, and any information regarding contracts, arrangements, understandings, or relationships with respect to the securities of the issuer. Plaintiff contends that the schedule 13d's filed by Thrall in connection with its purchase of Chamberlain stock were "false and misleading" in that they failed to disclose the

---

**8.** The Williams Act, 82 Stat. 454 *et seq.,* codified at 15 U.S.C. §§ 78m(d)–(e) and 78n(d)–(f), added new sections 13(d), 13(e) and 14(d)–(f) to the 1934 Act.

**9.** Section 13(d) states, in pertinent part, that: "(1) Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 12 of this title [15 USC § 78l] ..., is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered or certified mail, send to each exchange where the security is traded, and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations, prescribe as necessary or appropriate in the public interest or for the protection of investors—
"(A) the background, and identity, residence, and citizenship of, and the nature of such beneficial ownership by, such person and all other persons by whom or on whose behalf the purchases have been or are to be effected.
"(B) the source and amount of the funds or other consideration used or to be used in making the purchases, and if any part of the purchase price is represented or is to be rep-

resented by funds or other consideration borrowed or otherwise obtained for the purpose of acquiring, holding, or trading such security, a description of the transaction and the names of the parties thereto...
"(C) if the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities, any plans or proposals which such person may have to liquidate such issuer, to sell its assets to or merge it with any other persons, or to make any other major change in its business or corporate structure;
"(D) the number of shares of such security which are beneficially owned, and the number of shares concerning which there is a right to acquire, directly or indirectly, by (i) such person, and (ii) by each associate of such person, giving the background, identity, residence, and citizenship of each such associate; and
"(E) information as to any contracts, arrangements, or understandings with any person with respect to any securities of the issuer, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guaranties of loans, guaranties against loss or guaranties of profits, division of losses or profits, or the giving or withholding of proxies, naming the persons with whom such contracts, arrangements, or understandings have been entered into, and giving the details thereof."

details of defendants' "conspiracy ... to have Thrall takeover Chamberlain ... for less than adequate consideration." (Comp. ¶ 55(a)–(h)).

Defendants move to dismiss plaintiff's § 13(d) claim on the ground that she does not meet the standing requirements of § 18(a), 15 U.S.C. § 78r(a), the section of the Act that creates a private remedy for damages sustained "in reliance upon" a false or misleading filing made pursuant to the Act.[10] Defendants contend that plaintiff's voluntary tender of her Chamberlain shares subsequent to commencement of this action "clearly demonstrates that she did not sell any Chamberlain shares 'in reliance upon' documents filed with the SEC" (Def.Mem. at 14), an allegation essential to a section 18(a) claim. Plaintiff disputes defendants' characterization of section 18(a) as the "exclusive remedy" for a section 13(d) violation and argues generally that a private damages remedy is "implicit in the recognition of a private right of action for injunctive relief" under section 13(d).

While this Court has no quarrel with plaintiff's characterization of the regulatory objectives that prompted congressional enactment of the Williams Act, it is far from clear whether plaintiff can infer an independent damages remedy under section 13(d) and thereby evade section 18(a)'s explicit standing requirements. This issue must be considered against a background of continually evolving judicial formulations of the circumstances giving rise to a private cause of action. In recent years,

the Supreme Court has pursued an increasingly restrictive approach to implying private remedies. *See Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 374–78, 102 S.Ct. 1825, 1837–39, 72 L.Ed.2d 182 (1982). The relatively liberal inferences endorsed by the Court in *J.I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), wherein the broad remedial purposes of § 14(a) of the Act were held to give rise to a private right of action for damages, were considerably narrowed a decade later in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). *Cort* set forth four factors to be considered by a court in determining whether a private right of action is implicit in a given statute. These included legislative intent, consistency of such a remedy with the underlying purposes of the legislative scheme, whether the plaintiff was a member of the class for whose benefit the statute was enacted, and whether the cause of action is one traditionally relegated to state law. *Id.* at 78, 95 S.Ct. at 2088. More recently, in *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 14, 100 S.Ct. 242, 244, 62 L.Ed.2d 146 (1980), *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979), and *Merrill, Lynch, supra*, the Court narrowed the proper mode of analysis even further to a focused inquiry on the question of congressional intent,[11] either implicit or explicit, as evidenced by the language of the statute, the contemporary context of its enactment, its legislative history, and its place in the overall enforcement scheme. *Transameri-*

---

**10.** Section 18(a) provides, in pertinent part, that:

"(a) Any person who shall make or cause to be made any statement in any application, report, or document filed pursuant to this chapter or any rule or regulation thereunder ... which statement was at the time and in the light of the circumstances under which it was made false and misleading with respect to any material fact, shall be liable to any person (not knowing that such statement was false and misleading), who, in reliance upon such statement, shall have purchased or sold a security at a price which was affected by such statement, for damages caused by such reliance, unless the person sued shall prove that

he acted in good faith and had no knowledge that such statement was false and misleading...."

**11.** In *Transamerica, supra*, the Court stated:

[W]hat must ultimately be determined is whether Congress intended to create the private remedy asserted ..., 444 U.S. at 15–16, 100 S.Ct. at 245; The dispositive question remains whether Congress intended to create any such remedy. *Id.* at 24, 100 S.Ct. at 249. *See also Touche Ross & Co. v. Redington*, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979) (the judicial task is solely to determine congressional intent).

*ca, supra,* 444 U.S. at 23–24, 100 S.Ct. at 248–249.

■ Applying this analytical framework to section 13(d), one district court recently held that these factors "show an absence of legislative intent to imply a right of action under § 13(d)." *Leff v. CIP Corp.,* 540 F.Supp. 857, 864 (S.D.Ohio 1982). Noting the similarity between § 13(d) and § 17(a) of the 1934 Act, the *Leff* court relied in part on the Supreme Court's holding with respect to § 17(a) in *Touche Ross, supra.* The Court there stated:

> "In terms, § 17(a) simply requires broker-dealers and others to keep such records and file such reports as the Commission may prescribe. It does not, by its terms, purport to create a private cause of action in favor of anyone. It is true that in the past our cases have held that in certain circumstances a private right of action may be implied in a statute not expressly providing one. But in those cases finding such implied private remedies, the statute in question at least prohibited certain conduct or created federal rights in favor of private parties. (citations omitted) ... By contrast, § 17(a) neither confers rights on private parties nor proscribes any conduct as unlawful." 442 U.S. at 569, 99 S.Ct. at 2485.

Similarly, § 13(d) requires the filing of certain prescribed information with the Commission and does not, "by its terms, purport to create a private cause of action in favor of anyone." *Id.* No enforcement rights are expressly conferred on private parties nor is any conduct proscribed as unlawful.

The Court in both *Transamerica* and *Touche Ross* also noted that Congress had expressly provided a damages remedy under § 18(a) of the Act and, in *Touche Ross,* observed that "There is evidence to support the view that § 18(a) was intended to provide the exclusive remedy for misstatements in any reports filed with the Commission...." 442 U.S. at 573–74, 99 S.Ct. at 2487–88. The Court went on to state

that where Congress has created an express civil remedy for damages available to individuals injured by reporting violations, "we are extremely reluctant to imply a cause of action ... that is significantly broader than the remedy Congress chose to provide." 442 U.S. at 574. Given that buyers and sellers of securities injured as a result of their reliance on statements filed pursuant to § 13(d) may seek redress under § 18(a) of the Act, "it is doubtful," as the court in *Leff* noted, "that Congress 'forgot' to provide a remedy for § 13(d)." As stated by Judge Carter: "[T]his court has held consistently that no implied private cause of action for damages exists under 13(d), and that only where a complainant meets the seller or purchaser requirement of Section 18, 15 U.S.C. § 78r, does a cognizable claim for damages for a 13(d) violation lie." *Wellman v. Dickinson,* 497 F.Supp. 824, 835 (S.D.N.Y.1980), *affd,* 647 F.2d 163 (2d Cir.1982). *See Myers v. American Leisure Time Enterprises,* 402 F.Supp. 213, 214–15 (S.D.N.Y.1976), *aff'd,* 538 F.2d 312 (2d Cir.1976); *Herman v. Beretta,* [1978 Transfer Binder], Fed.Sec. L.Rep. (CCH) ¶ 96,013, 91,553–54 (S.D.N.Y. 1978); *Gateway Industries, Inc. v. Agency Rent A Car, Inc.,* 495 F.Supp. 92, 99 (N.D. Ill.1980); *Indiana National Corporation v. Rich,* 554 F.Supp. 864, 873 (S.D.Ind. 1982); *Issen v. GSC Enterprises, Inc.,* 508 F.Supp. 1278, 1295 (N.D.Ill.1981). *Cf. Scientex Corporation v. Kay,* 689 F.2d 879, 885 (9th Cir.1982); *In re Penn Central Securities Litigation,* 494 F.2d 528, 540 (3d Cir.1974); *Phillips v. TPC Communications, Inc.,* 532 F.Supp. 696, 698–99 (W.D.Pa.1982); *Rosengarten v. International Telephone & Telegraph Corp.,* 466 F.Supp. 817, 827 (S.D.N.Y.1979); *DeWitt v. American Stock Transfer Co.,* 433 F.Supp. 994, 1005 (S.D.N.Y.1977).

Although courts have consistently refused to imply private rights of action for damages under § 13(d) and similar reporting provisions in the 1934 Act, this unanimity has not been paralleled in the context of injunctive relief. In *GAF Corp. v. Milstein,* 453 F.2d 709 (2d Cir.1971), *cert. de-*

*nied,* 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972) and *Treadway Companies Inc. v. Care Corporation,* 638 F.2d 357, 380 (2d Cir.1980), the Court of Appeals for this Circuit explicitly acknowledged the availability of injunctive relief under section 13(d) to ensure that the statute's underlying disclosure objective is met—i.e., "to alert the marketplace to every large, rapid aggregation or accumulation of securities ... which might represent a potential shift in corporate control." *GAF Corp., supra,* 453 F.2d at 717. *See Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975). While this distinction between remedies requested has been challenged by litigants who argue that no private right of action whatsoever should be implied under § 13(d), *see, e.g., Kaufman and Broad, Inc. v. Belzberg,* 522 F.Supp. 35, 41 (S.D.N.Y.1981), and explicitly rejected by some courts, *see Leff v. CIP Corp., supra,* 540 F.Supp. at 864 ("*GAF Corp.* ... relied on the now discredited *Borak....* Accordingly, plaintiffs cannot seek injunctive relief pursuant to § 13(d)"); *Indiana National Corp., supra,* it is a question that need not be decided here. Cases in which the court inferred a private right of action for injunctive relief under § 13(d) are simply inapposite to the relief requested here, and plaintiff's reliance on those cases is unpersuasive. To the extent that plaintiff suggests that a private remedy for damages is implicit in the recognition of a private right of action for injunctive relief, the cases that have addressed that question in the context of § 13(d) are to the contrary.

Having determined that plaintiff's only potential remedy for damages is section 18(a) of the Act, this Court finds that plaintiff's complaint is deficient in that she fails to allege, as required by that provision, a purchase or sale of Chamberlain stock "in reliance upon" a misleading filing pursuant to § 13(d), "not knowing that such statement was false or misleading." Plaintiff sold most of her Chamberlain shares in response to defendant Thrall's tender offer and subsequent to the filing of this action. In short, plaintiff's allegations of fraud and deception with respect to § 13(d) disclosure preceded, and logically preclude, any assertion of reliance on a misleading schedule 13(d).[12]

b) *Section 10(b)*

Defendants also seek to dismiss plaintiff's claim under section 10(b), 15 U.S.C. § 78j(b),[13] on the ground that plaintiff does not allege that she "purchased or sold securities 'substantially' because of a misleading statement or without essential knowledge that should have been disclosed." (Def.Mem. at 15). Plaintiff, citing this Circuit's decision in *Vine v. Beneficial Finance Co.,* 374 F.2d at 627 (2d Cir.1967), *cert. denied,* 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967), argues that reliance is not an essential element of a § 10(b) cause of action in the context of a "forced" sale—i.e., where, as a consequence of defendant's prior fraud, plaintiff is placed in a position where he has no choice but to divest himself of his stock.

Section 10(b) of the 1934 Act forbids manipulative or deceptive conduct "in connection with the purchase or sale of any

---

12. Plaintiff appears to suggest in her memorandum in opposition to defendants' motion to dismiss that her complaint states a claim for relief pursuant to § 13(e) of the Act (Pl.Mem. at 55). The complaint, however, does not set forth a § 13(e) cause of action, and, in light of this Court's disposition of plaintiff's motion to file a third amended complaint, I decline to entertain informal amendments to the complaint introduced by way of the parties' briefs.

13. Section 10(b) states that:
"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
\* \* \* \* \* \*
"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

security...." Rule 10b–5, promulgated thereunder, makes it unlawful for any person, directly or indirectly,

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

As the Supreme Court has made clear, § 10(b) and Rule 10b–5 are intended to afford redress only for injuries suffered as a result of deceptive practices "touching" or "in connection with" the purchase or sale of securities. *Superintendent of Insurance of New York v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12–13, 92 S.Ct. 165, 169, 30 L.Ed.2d 129 (1971). In order to "restrict the potentially limitless thrust of Rule 10b–5 to those situations in which there exists causation in fact between the defendant's act and the plaintiff's injury," *Titan Group, Inc. v. Faggen*, 513 F.2d 234, 238–39 (2d Cir.1975), courts have generally looked to plaintiff's reliance on the alleged misrepresentation as a prerequisite to recovery. *Id.* See also *Madison Consultants v. Federal Deposit Insurance Corp.*, 710 F.2d 57, 62 (2d Cir.1983); *List v. Fashion Park, Inc.*, 340 F.2d 457, 462–63 (2d Cir.), *cert. denied sub nom. List v. Lerner*, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965).

 While the concepts of reliance and causation have frequently been deemed interchangeable in the context of Rule 10b–5 cases, *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228, 239 (2d Cir.1974), a logical and necessary distinction has been made between cases alleging affirmative misrepresentations and those alleging nondisclosure, as in the instant action. In the case of an omission, the usual bifurcated inquiry—(1) Did plaintiff believe what defendant said?; and (2) Did that belief cause plaintiff to act?—obviously is inapplicable, and the question is more appropriately phrased as one of materiality. As stated by the Supreme Court in *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1971): "All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision.... This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact." *Id.* at 153–54, 92 S.Ct. at 1472. *See Pellman v. Cinerama*, 89 F.R.D. 386, 387 (S.D.N.Y.1981). The plaintiff is not required to prove that the defendant's act was the exclusive cause of his injury, but rather that it was a "significant contributing cause." *Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88, 92 (2d Cir.1981), *quoting Herzfeld v. Laventhol, Krekstein, Horwath & Horwath*, 540 F.2d 27, 34 (2d Cir.1976).

Whatever semantic distinctions courts have drawn in determining whether the requisite elements of a § 10(b) cause of action have been stated, the inquiry into reliance or materiality necessarily subsumes a finding that plaintiff has purchased or sold stock *because* he was misinformed or uninformed, and that, properly informed, "he would have succeeded in preventing the loss he in fact suffered." *Madison Consultants, supra*, 710 F.2d at 62. Plaintiff's § 10(b) allegations, as set forth in her complaint, are best addressed by chronologically differentiating between claims regarding defendants' activities in the pre-offer period and events surrounding the tender offer itself.

 As defendants observe, the thrust of plaintiff's 10b–5 claim with respect to the period January 1977 to April 1979, when Thrall was purchasing Chamberlain stock, is that Thrall was trading on the basis of inside information regarding the Mason-Chamberlain joint venture and Chamberlain's internal earnings projections (Pl.Mem. 33; Comp. ¶¶ 22–29). However, it

is clear that plaintiff was neither a purchaser nor a seller of Chamberlain shares during this period and thus has no claim under section 10(b) or Rule 10b–5.[14] " 'Mere retention' of securities during a period of an alleged violation does not satisfy the [purchaser-seller] requirement...." *Freschi v. Grand Coal Venture*, 551 F.Supp. 1220, 1227 (S.D.N.Y. 1982). Insider sellers are subject to a duty to disclose only to "persons who during the same period purchased stock in the open market without knowledge of the material inside information ... in the possession of defendants." *Shapiro, supra*, 495 F.2d at 237. As stated by the Court of Appeals for this Circuit:

"To extend the period of liability well beyond the time of the insider's trading simply because disclosure was never made could make the insider liable to all the world.... Any duty of disclosure is owed only to those investors trading contemporaneously with the insider; non-contemporaneous traders do not require the protection of the 'disclose or abstain' rule because they do not suffer the disadvantage of trading with someone who has superior access to information." *Wilson v. Comtech Telecommunications, supra*, 648 F.2d at 94–95.

By the time of the tender offer, when plaintiff did become a seller of securities by tendering 890 of her 900 shares, she had already commenced this action, an affirmative negation, defendants argue, of any reliance on prior omissions or representations.

■ In response to the suggestion that she lacks standing to sue under § 10(b), plaintiff invokes the "forced seller" exception to the purchaser-seller requirement. In the classic Rule 10b–5 case, the plaintiff himself buys or sells stock in reliance upon the defendant's unlawful representations or conduct. However, as the Court of Appeals for this Circuit has repeatedly held, "an owner of securities who is forced to sell them against his will has standing as a 'seller' for purposes of Rule 10b–5." *Madison Consultants v. Federal Deposit Insurance Corp.*, 710 F.2d 57, 61 (2d Cir.1983). *See Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787, 797 (2d Cir.1969), *cert. denied*, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970); *Vine v. Beneficial Fi-*

---

**14.** In addition, to the extent plaintiff seeks to impose liability for nondisclosure of information that might best be characterized as "predictions" or "projections," the Court of Appeals for this Circuit has explicitly held that "Full factual disclosure need not be embellished with speculative financial predictions." *Rodman v. Grant Foundation*, 608 F.2d 64, 72 (2d Cir.1979). *See Billard v. Rockwell International Corp.*, 526 F.Supp. 218, [1981 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 98,358, 92,203 (S.D.N.Y.1981). The Appellate Court of Illinois, confronted with allegations similar to those before this Court regarding the Mason-Chamberlain joint venture, stated as follows:

"In the case at bar, plaintiff alleges defendants misrepresented the future profitability of the joint venture previously mentioned. However, we do not find any misrepresentation or nondisclosure of a present material fact. The existence of the venture was mentioned in Chamberlain's annual prospectus, though no mention of expected profits was included, and the venture was again fully disclosed and described in Thrall's tender offer. Thrall's representation of the future profitability of the venture can only be categorized as an opinion of a future occurrence which, without more, is not actionable.

"Just as Thrall's statement regarding the future profitability of the joint venture cannot be the basis of a cause of action for fraud, neither can it be the basis of a cause of action for stock manipulation or insider trading in connection with the tender offer.... In fact, in tender offers ' "presentations of future earnings, appraised asset evaluations and other hypothetical data" ' are 'to be discouraged.' *Alaska Interstate Co. v. McMillian* (D.Del. 1975), 402 F.Supp. 532, 567, quoting from *Kohn v. American Metal Climax, Inc.*, (3rd Cir.1972), 458 F.2d 255, 265, *cert. denied*, 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126." *Ziskin v. Thrall Car Manufacturing Co., supra.*

Similarly, the Third Circuit recently held that "it is not necessary to disclose, in connection with a purchase or sale of securities, the occurrence of preliminary merger discussions ... [which] may itself be misleading. A substantial body of opinion suggests that disclosure of [such] discussions would, by and large, do more harm than good to shareholders and the values embodied in the anti-fraud provisions of the Act." *Staffin v. Greenberg*, 672 F.2d 1196, 1205–06 (3d Cir.1982). The *Staffin* court went on to note that there are similar drawbacks to premature disclosure "in the related area of 'takeover bids,' that is, cash tender offers." *Id.* at 1206.

**964**

*nance, supra.* Plaintiff's argument essentially is that Thrall, by failing to disclose material information regarding Chamberlain during the period in which it was acquiring over 50 percent of the company's stock (Comp. ¶ 28), and by announcing prior to the actual tender offer its intention to offer $26.50 per share when it intended to offer $30.00 per share (Comp. ¶ 57), artificially depressed the price at which these shares would have traded had defendants made full disclosure (Comp. ¶ 59). Plaintiff suggests that this conduct on the part of defendants placed her in the position of a forced seller (Pl.Mem. in Opp. at 34–36).

In *Vine v. Beneficial Finance, supra,* the primary case upon which plaintiff relies, the Court of Appeals for this Circuit addressed a situation in which, as a result of defendants' deceptive acts, plaintiff, as a practical matter, had no option but to exchange his shares for cash, either by accepting the defendant corporation's cash offer or by pursuing his appraisal remedy. The circumstances of the *Vine* case are instructive in construing the parameters of the forced-seller doctrine. Plaintiff Vine owned 100 shares of Class A common stock in Crown Finance Company, Inc. The fraudulent scheme undertaken by the *Vine* defendants involved the purchase at inflated prices of Class B shares held primarily by corporate insiders, and the subsequent public tender for Class A shares at a far lower price, without disclosure of the favorable Class B purchase. Once defendants had succeeded by means of this fraudulent scheme in acquiring 95% of Crown's A stock, they were in a position to effect a short-form merger, which does not require approval of the remaining non-tendering shareholders, thereby forcing plaintiff to divest himself of his shares in order to realize any value for his stock. In short, "once the conditions for a short form merger had been achieved, appellant's rights in his stock were frozen." *Id.* at 634. In these circumstances, where the deception of those Class A stockholders who tendered their shares was a necessary predicate to the subsequent short-form merger which forced plaintiff, as a matter of law, to sell

his shares, the fraud practiced on the actual sellers was held to be "in connection with" the forced sale by plaintiff. The court concluded that "What must be shown is that there was deception which misled Class A stockholders and that this was in fact the cause of plaintiff's claimed injury." *Id.* at 635.

█ In the instant action, the allegations set forth in plaintiff's complaint simply do not adequately demonstrate this causal link. Without exception, plaintiff's allegations of nondisclosure relate to the period prior to defendants' tender offer, and these allegedly deceptive omissions were fully disclosed at the time the offer was made. The Offer Booklet announcing Thrall's desire to purchase outstanding Chamberlain shares detailed Thrall's purchase history in the period January 1977 through April 1979 (Offer Booklet, App. C); disclosed the fact that five members of the twelve-member Chamberlain board of directors were Thrall nominees (*id.* at 2); disclosed Thrall's fluctuating intentions with respect to acquisition of Chamberlain during the period September 1976 to the time of the offer (*id.* at 19–20); described Thrall's business relationships with certain board members (*id.* at 21); indicated its intention to propose a cash merger between Chamberlain and a wholly-owned subsidiary of Thrall after completion of the tender offer (*id.* at 1); disclosed its access to Chamberlain's 1980 internal profit projections and set forth those projections (*id.* at 14–15); and detailed the potential profitability of the Mason-Chamberlain joint venture (*id.* at 15–16).

In sum, those individuals who chose to tender their shares in response to the August 1979 offer were fully apprised of the various facts allegedly concealed by defendants in the pre-offer period. This is not a situation, in other words, where a fraud on one group of shareholders triggered a forced sale by other shareholders, thus encompassing the latter group within the protective scope of section 10(b).

■ It is equally important to note that, prior to the tender offer, Thrall did not have the requisite two-thirds ownership interest required to consummate its merger under Iowa law. Iowa Code § 496A.70 (1981).[15] Accordingly, as distinct from *Vine*, a crucial step in its ultimate objective was accomplished only after full disclosure and an overwhelmingly positive response on the part of shareholders representing shares not owned by Thrall.[16] If, as plaintiff states, the facts disclosed in the Offer Booklet led her to conclude that defendants had not been sufficiently forthcoming in the pre-offer period, other shareholders could draw the same conclusion, withhold their shares, and thereby thwart Thrall's acquisition efforts.[17] Thrall was under no obligation, as plaintiff appears to suggest, to characterize its pre-offer activities as a "conspiracy ... to force out the minority shareholders...." (Comp. ¶ 56(h)):

> "As long as minority shareholders are not misled about the actual terms of a

transaction, it is not deceptive for corporate insiders to fail to characterize the transaction or their own role with pejorative nouns or adjectives or fail to draw adverse inferences from the facts disclosed. A reasonable shareholder may be required to draw his or her own inferences, whether they may be positive or negative in the circumstances of a particular case. [citations omitted]." *Issen v. GSC Enterprises, Inc.*, 508 F.Supp. 1278, 1290 (N.D.Ill.1981).

*See also Biesenbach v. Guenther*, 588 F.2d 400, 402 (3d Cir.1978); *Lavin v. Data Systems Analysts, Inc.*, 443 F.Supp. 104 (E.D. Pa.1977); *Stedman v. Storer*, 308 F.Supp. 881, 887 (S.D.N.Y.1969).

I conclude that plaintiff has not stated a cause of action under § 10(b) of the Act. As recently stated by the Ninth Circuit in an analogous case:

> "[T]he basis of plaintiff's grievance is that by the time they sold their stock, the

**15.** The pertinent Iowa provision requires:
"Approval by shareholders. The board of directors of each corporation, upon approving such plan of merger or plan of consolidation, shall, by resolution, direct that the plan be submitted to a vote at a meeting of shareholders, which may be either an annual or a special meeting. Written or printed notice shall be given to each shareholder of record entitled to vote at such meeting, not less than twenty days before such meeting, in the manner provided in this chapter for the giving of notice of meetings of shareholders, and shall state the purpose of the meeting, whether the meeting be an annual or a special meeting. A copy or a summary of the plan of merger or plan of consolidation, as the case may be, shall be included in or enclosed with such notice.
"At each such meeting, a vote of the shareholders shall be taken on the proposed plan of merger or consolidation. Each outstanding share of each such corporation shall be entitled to vote on the proposed plan of merger or consolidation, whether or not such share has voting rights under the provisions of the articles of incorporation of such corporation. The plan of merger or consolidation shall be approved upon receiving the affirmative vote of the holders of at least two-thirds of the outstanding shares of each such corporation...." Iowa Code § 496A.70 (1981).

**16.** It should also be noted that the merger contemplated by Thrall, unlike that in *Vine, supra*, was a long-form merger requiring solicitation of

proxies from those shareholders who had not tendered their shares. Although Thrall controlled a sufficient number of shares by that time to ensure approval of the plan, it is still notable that 89 percent of the non-Thrall-owned shares were voted in favor of the merger, despite the fact that the proxy statement included a copy of plaintiff's complaint (Def.Exh. 1).

**17.** To the extent that plaintiff seeks support in cases articulating variations on a "fraud-on-the-market" theory, *see, e.g., Shores v. Sklar*, 647 F.2d 462 (5th Cir.1981), I find her arguments unpersuasive. As recently stated by one court:
"[Under] the fraud-on-the-market theory ..., the element of reliance is not entirely eliminated. The basis for permitting recovery under the fraud-on-the-market theory is that a party has caused manipulation of the market to occur and a purchaser on the open market, unaware of the manipulation, has relied upon the sophistication of the market to establish the market price. Under the fraud-on-the-market theory, no liability attaches where the individual plaintiff purchased despite knowledge of the falsity of a representation, or would have purchased had he known of it. See *Blackie v. Barrack*, 524 F.2d 891, 906 (9th Cir.1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976)." *Oklahoma Publishing Co. v. Standard Metals Corp.*, 541 F.Supp. 1109, 1112 (W.D.Okla.1982).

informal market had been destroyed and stock prices had fallen. Plaintiffs were clearly not misled at the time the sales took place. The sales were not, therefore, 'in connection with' the allegedly deceptive or manipulative practices. Plaintiffs cannot bring themselves within the statutory requirement by selling their stock at a time when they were fully aware of the facts and after any deception had ceased." *Shivers v. Amerco,* 670 F.2d 826, 830 (9th Cir.1982). *See also Fischer v. New York Stock Exchange,* 408 F.Supp. 745, 754 (S.D.N.Y. 1976).

c) *Section 14(e)*

Plaintiff also makes reference in her third claim for relief to section 14(e) of the Act, 15 U.S.C. § 78n(e), which provides as follows:

"(e) It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative."

Section 14(e), like section 13(d) discussed above, was enacted as part of the 1968 Williams Act. While investor protection is certainly a concern central to the Act, Congress explicitly recognized the useful purpose served by takeover bids and sought, by virtue of this legislation, "to strike a balance between the investor, management and the takeover bidder." *Edgar v. Mite Corp.,* 457 U.S. 624, 632, 102 S.Ct. 2629, 2636, 73 L.Ed.2d 269 (1982). The various requirements imposed by the Williams Act

represent "a conviction that neither side in [a takeover] contest should be extended additional advantages vis-a-vis the investor, who if furnished with adequate information would be in a position to make his own informed choice." *Id.*

■ I make reference to congressional intent by way of preface to the observation that section 14(e), and other provisions of the Williams Act, were never intended to serve an omnibus police function, but rather were intended to ensure full and fair disclosure in the more limited context of the offer itself, as much to ensure a fair takeover contest as to keep investors fully apprised. Courts asked to construe the provisions of the Williams Act have observed that the protection it affords is responsive to the exigencies of the tender offer situation, which forces a shareholder to act promptly, *see Piper v. Chris-Craft Industries,* 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977); *Bucher v. Shumway,* 452 F.Supp. 1288, 1294 (S.D.N.Y.1978), and several courts have noted that the distinguishing characteristic of the activity regulated by the Williams Act is "the exertion of pressure on the shareholders to make a hasty, ill-considered decision to sell their shares." *Panter v. Marshall Field,* 646 F.2d 271, 286 (7th Cir.1981), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). *See Wellman v. Dickinson,* 475 F.Supp. 783 (S.D.N.Y.1979), *aff'd,* 682 F.2d 355 (1981); *S–G Securities, Inc. v. Fuqua Investment Co.,* 466 F.Supp. 1114 (D.Mass.1978). Accordingly, in line with the Act's intentionally limited reach, misrepresentations, nondisclosures, or manipulative practices actionable under § 14(e) must be "in connection with" the tender offer. "The Williams Act ... contemplates public disclosure and filing with the S.E.C. only after a tender offer is initiated." *Staffin v. Greenberg,* 672 F.2d 1196, 1206 (3d Cir.1982).

Plaintiff's section 14(e) claim appears to be premised solely on activities prior to the August 1979 offer to purchase. The complaint reiterates the various pre-offer activities alleged in connection with plaintiff's

§ 13(d) and § 10(b) claims, as well as asserting that Thrall "deliberately made a false pre-offer announcement that [it] intended to make a tender offer at $26.50 per share when Thrall knew that the offer would in reality be made at $30.00 per share." (Pl.Mem. in Opp. at 66; Comp. ¶ 57). These discrete activities, plaintiff suggests, should be viewed as contributory elements in Thrall's "attempt to freeze out the minority shareholders" (Pl.Mem. in Opp. at 66), and, as such, actionable under section 14(e) despite their chronology.

With respect to those activities substantially in advance of the tender offer—i.e., the filing of allegedly false schedule 13d's, the dissemination of misleading proxy statements, and so forth—defendants argue that those events occurred "months and even years before Thrall's August 1979 tender offer" and thus cannot even arguably meet the "in connection with any tender offer" requirement of § 14(e) (Def. Mem. at 17). Plaintiff, on the other hand, would construe the statute's language far more liberally to reach the conduct complained of here. The "in connection with" requirement was recently addressed by the Court of Appeals for the Seventh Circuit in an instructive and persuasive opinion:

> "The language is not unambiguous, but it does seem to contemplate the existence of an effective offer capable of acceptance by the shareholders. The legislative history of the Act is replete with indications that Congress intended to protect an investor faced with the pressures generated by the exigencies of the tender offer context, and that the sole purpose of § 14(e) is protection of the investor faced with the decision to tender or retain his shares.... *See Hearings on S.510 Before the Subcomm. on Securities of the Senate Comm. on Banking and Currency*, 90th Cong., 1st Sess. 33 (1967) (statement of Manuel F. Cohen, Chairman, SEC) ('[T]he bill is designed first, to provide those who receive a tender offer with information adequate to an informed decision whether or not to accept....'); *id.* at 203, 205 (bill's purpose is 'to assure that public sharehold-

ers will be given information adequate for an informed decision when a tender offer is made for the shares of their company'; disclosure needed so shareholder can 'make an intelligent decision whether or not to tender his shares')." *Panter, supra,* 646 F.2d at 285–286.

Plaintiff's attempt here to fashion a virtual dragnet out of a statute with a clearly limited scope must fail. The cases relied on to support the proposition that "activities prior to the formal announcement of a tender offer [are] not excluded from the prohibitions of § 14(e)" (Pl.Mem. in Opp. at 67) are readily distinguishable from the circumstances of the instant action. In *Lewis v. McGraw*, 619 F.2d 192 (2d Cir.1980), the court noted only that "statements made on the eve of a tender offer" are not wholly outside the scope of the Williams Act, an observation prompted by the fact that "where it appears that an offer is likely, and that reliance upon the statements at issue is probable," *id.* at 195, it would subvert the objectives of section 14(e) to insulate the dissemination of misleading information. Clearly the *Lewis* court was contemplating a "tender offer context," wherein, although a formal offer had not yet been made, the offer was sufficiently a matter of market knowledge to trigger the prophylactic objectives of the Act. Similarly, in *Applied Digital Data Systems, Inc. v. Milgo Electronic Corp.*, 425 F.Supp. 1145 (S.D.N.Y.1977), Judge Weinfeld recognized that the statute's remedial purposes would be frustrated if "misstatements, omissions and half-truths" regarding an "imminent tender ... could be promulgated with relative impunity until the offer was actually filed with and approved by the SEC." *Id.* at 1154.

The acts complained of by plaintiff Sanders cannot be characterized as taking place "on the eve" of a tender offer. Indeed, plaintiff's attempt to bring them within the ambit of the 1979 offer is somewhat paradoxical in light of plaintiff's insistence on Thrall's failure to disclose its purported takeover objective when it first began purchasing Chamberlain shares in 1978. Giv-

en that § 14(e) has been consistently construed as a provision directed toward "shareholders *confronted* with a tender offer," *Panter, supra*, 646 F.2d at 271—either in fact or by virtue of its imminence—the suggestion that Chamberlain shareholders were oblivious to the alleged acquisition scheme during the period when misrepresentations were made would seem to vitiate plaintiff's § 14(e) claim.

In addition, as noted above, the Offer Booklet issued in connection with the tender offer made full disclosure. Thus, at the time Chamberlain shareholders were "faced with the decision whether to tender," *Bolton v. Gramlich*, 540 F.Supp. 822, 836 (S.D.N.Y.1982), the crucial period for § 14(e) purposes, there was no longer a misrepresentation upon which they could rely, an essential element of a § 14(e) cause of action. *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 373 (2d Cir.1973), *cert. denied*, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973). Mindful of the Supreme Court's demonstrated reluctance to expand access to federal remedies in private federal securities actions by unduly expansive interpretations of the securities laws, *see O'Brien v. Continental Illinois National Bank & Trust Co.*, 593 F.2d 54, 62–63 (7th Cir.1979), I decline to read section 14(e) to encompass conduct and statements made well in advance of a subsequent tender offer and with no apparent relation to it.

While Thrall's announcement two weeks prior to the actual tender offer of its intention to offer $26.50 per share in its takeover bid arguably meets the threshold "in connection with" requirement, plaintiff has not stated a § 14(e) claim. An actual deception or misrepresentation, not simply a breach of fiduciary duty, is a necessary element of any section 14(e) violation. *Martin Marietta Corp. v. The Bendix Corp.*, 549 F.Supp. 623, 628–30 (D.Md. 1982). *Cf. Santa Fe Industries*, 430 U.S. 462, 476, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977). The deception plaintiff asserts is that Thrall, fully knowing it would offer $30.00 per share, intentionally disseminated a false statement in the pre-offer period that it would offer $26.50 per share (Comp. ¶ 57). Plaintiff's brief, however, directly controverts this assertion, stating that "the filing of this lawsuit had an immediate beneficial effect for the class which plaintiff seeks to represent.... Thrall announced it was going to boost its tender offer to $30.00 a share...." (Pl.Mem. in Opp. at 7). Plaintiff's attribution of the increased price to natural market forces would seem to be inconsistent with her allegation of intentional deception in the pre-offer announcement.

Further, whatever defendant's actual intent, it remains the case that the market price for Chamberlain rose following the pre-offer announcement (Def.Exh. 6) and the tender offer was made at $30.00 per share. Defendants argue, therefore, that the essential element of reliance on a deceptive statement is necessarily absent, since plaintiff never had an opportunity to act on the $26.50 offer. In support of this argument, they cite to the Second Circuit's opinion in *Lewis v. McGraw*, 619 F.2d 192 (2d Cir.1980), wherein the Court affirmed dismissal of a § 14(e) claim after concluding that "the target's shareholders simply could not have relied upon McGraw-Hill's statements, whether true or false, since they were never given an opportunity to tender their shares." *Id.* at 195.

While *Lewis* is distinguishable from the instant case in that the anticipated tender offer never became effective, thereby rendering it literally impossible for shareholders to rely on the alleged misrepresentations, the decision's underlying rationale is pertinent here. As *Lewis* makes clear, the element of reliance is considered central to a § 14(e) cause of action because the provision is designed specifically to prevent shareholders from making a tender offer decision on the basis of inadequate or inaccurate information. *Id.; Panter, supra*, 646 F.2d at 283. "In enacting the provision, Congress intended to improve the flow of information to the shareholder faced with the decision whether to tender." *Bolton v. Gramlich*, 540 F.Supp. 822, 836

(S.D.N.Y.1982). Accordingly, once full and fair disclosure occurs, "the fairness of the terms of the transaction is at most a tangential concern of the statute." *Altman v. Knight*, 431 F.Supp. 309, 314 (S.D.N.Y. 1977), quoting *Santa Fe, supra*, 430 U.S. at 478, 97 S.Ct. at 1303. *See McFarland v. Memorex Corp.*, 96 F.R.D. 357, 364 (N.D. Cal.1982) ("liability under the securities acts is terminated when curative information is publicly announced").

Because I find that the Offer Booklet adequately disclosed information pertinent to the tender offer, including the factors considered by Thrall and those explicitly rejected by it in establishing its offer price (Offer Booklet B–6–8), I conclude that defendants' advance announcement of a lower offer price does not constitute a § 14(e) violation. The information thereafter presented in the Offer Booklet was not so abstruse or deceptively packaged as to require shareholders to possess "the sensitive antennae of investment analysts" to make use of it. *Schlesinger Investment Partnership v. Fluor Corp.*, 671 F.2d 739, 743 (2d Cir.1982), quoting *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1297 (2d Cir.1973), and once disclosure was complete, defendants were free to proceed expeditiously. In dismissing a complaint similar to that presented here—i.e., that defendants schemed to "cap" or artificially depress the market price of shares prior to a tender offer by waiting to disclose favorable information until the offer was announced—Judge Lasker held that the duty to disclose did not encompass a duty "to await the market's reaction to the information before announcing its intention to buy or sell." *Billard v. Rockwell International Corp.*, 526 F.Supp. 218, [1981 Transfer

Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,358, 92,-202 (S.D.N.Y.1981). Nor is there a "legal duty enforceable under the federal securities laws to state that the price offered is unfair." *Id.* Once Thrall made available to Chamberlain shareholders information with which to adequately evaluate the reasonableness of the price offered, its duty under the federal securities laws had been met.[18]

### d) *State Law Claims*

Plaintiff also invokes this Court's pendent and diversity jurisdiction to assert common law claims of fraud and breach of fiduciary duty. While dismissal of plaintiff's federal claims removes the basis for pendent jurisdiction, defendants have not contested that diversity jurisdiction exists. Plaintiff's claim, briefly stated, is that the defendant directors participated in, or aided and abetted, Thrall's trading on inside information during the pre-offer period while withholding this information from the market (Comp. ¶ 55(d)), thereby depressing the value of Chamberlain shares owned by minority shareholders. Plaintiff further asserts, in regard to Thrall's announced intention to offer $26.50 per share, that defendants "knew that Thrall's statement was false because they knew the tender offer would be at $30.00 per share" (Comp. ¶ 57), and that defendants breached their fiduciary duty as directors "when they arbitrarily fixed the price at which shares ... would be purchased at $30 per share...." (Comp. ¶ 59).

Plaintiff's common law fraud claim suffers from the same deficiencies as her analogous federal securities claims. Under New York law, plaintiff must establish justifiable reliance on the misrepresen-

---

**18.** In *Ziskin v. Thrall Car, supra*, slip op. at 12, 106 Ill.App. at 488, 62 Ill.Dec. at 260, 435 N.E.2d at 1232, the Illinois Appellate Court observed: "We find significant that all of plaintiff's allegations revolve around his basic assertion that the tender offer was simply too law. Aside from the general principle that the adequacy of a tender offer should be decided in the market place (*Seaboard World Airlines, Inc. v. Tiger International, Inc.* (2nd Cir.1979), 600 F.2d 355, 361–62), plaintiff has a completely

adequate remedy under the Iowa appraisal statute. All the factors which plaintiff alleges make the inherent value of the Chamberlain stock higher than either the tender price or the market price, such as a low dividend rate and the future profitability of the joint venture, can be brought to the attention of the Iowa trial court if it is called upon to make an independent judicial determination of the value of the stock."

tations alleged, *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2d Cir.1980), and that "the loss claimed to have been suffered was a *consequence* of the fraud, with the elements of materiality and ... reliance serving as essential links in the causative chain." *Madison Fund, Inc. v. Charter Co.*, 406 F.Supp. 749, 752 (1975) (emphasis in original). These issues were addressed with respect to plaintiff's federal claims and I will not belabor them here. Suffice it to say that plaintiff has not stated a fraud claim under New York law.

The parties are in agreement that, under New York's "internal affairs" choice-of-law rule, this Court should look to the law of the state of incorporation to determine the fiduciary duty of Chamberlain's directors. *Hausman v. Buckley*, 299 F.2d 696, 702 (2d Cir.1962). As stated by the Iowa Supreme Court, "our decisions have enhanced the obligations of agents and fiduciaries, functioning in positions of trust and confidence, to perform their duties in complete candor, honesty, loyalty and good faith." *Miller v. Berkoski*, 297 N.W.2d 334, 340 (Sup.Ct. Iowa 1980). In the corporate context generally, the obligation contemplated is one of disclosure:

> "Where an officer or director of a corporation proposes to purchase stock from an individual stockholder, such officer or director occupies a fiduciary capacity towards the stockholder with whom he is dealing, and is in duty bound to disclose evidence bearing upon the value of the stock coming to his knowledge as an officer or director of the company." *Humphrey v. Baron*, 223 Iowa 735, 273 N.W. 856, 857 (1937).

*See Linge v. Ralston Purina Co.*, 293 N.W.2d 191, 194–95 (Iowa S.Ct.1980); *Dawson v. National Life Insurance Co.*, 157 N.W. 929 (Iowa S.Ct.1916). As applied to a tender offer transaction, this duty has been characterized as one of "not go[ing] forward with the tender offer without first disclosing to all shareholders all material information...." *Life Investors, Inc. v. AGO Holding, N.V.*, [1981 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,343, 92,110 (N.D.Iowa 1981). Having already deter-

mined that, prior to plaintiff's tender of shares, defendant Thrall met its disclosure obligation in the Offer Booklet accompanying its request to purchase, I find no breach of a majority shareholder's fiduciary obligation to a minority shareholder. To the extent plaintiff is premising her fiduciary breach claim on injury to the corporation or to other shareholders who sold stock in the pre-offer period, plaintiff has no cause of action outside the context of a derivative suit. *Cunningham v. Kartridg Pak Co.*, 332 N.W.2d 881, 883 (Iowa S.Ct. 1983).

For the above reasons, plaintiff's third claim for relief is dismissed.

*Fourth, Fifth and Sixth Claims for Relief*

Plaintiff's remaining claims substantially track her individual federal and state claims but are brought derivatively. Defendants argue that, because plaintiff is no longer a Chamberlain shareholder, she fails to meet the requirement implicit in Fed.R.Civ.P. 23.1 that "a plaintiff in a derivative action must maintain his shareholder status throughout the pendency of the lawsuit, and an action will abate if the plaintiff loses his shareholder status before the litigation ends." *Portnoy v. Kawecki Berylco Industries, Inc.*, 607 F.2d 765, 767 (7th Cir.1979). *See Tryforos v. Icarian Development Co.*, 518 F.2d 1258 (7th Cir.1975), *cert. denied*, 423 U.S. 1091, 96 S.Ct. 887, 47 L.Ed.2d 103 (1976); *Rothenberg v. United Brands Co.*, [1977–78 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,045 (S.D.N.Y.1977). Given the disposition of plaintiff's individual causes of action, however, an even more fundamental requirement of class representation mandates dismissal of these remaining claims: "A plaintiff without a claim cannot represent a class of persons with possible claims." *Feldman v. Simkins Industries, Inc.*, 679 F.2d 1299, 1306 (9th Cir.1982).

Accordingly, plaintiff's fourth, fifth, and sixth claims for relief are dismissed.

### III.

### CONCLUSION

For the reasons stated, plaintiff Sanders motion to amend her complaint is denied.

Defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) and (6) is granted.

The Clerk of the Court is directed to dismiss the complaint with prejudice and without costs.

It is So Ordered.